UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| DENNIS ADKINS, TRACY BAGATTA, DEBORAH COWAN, MARY ELLEN DESCHAMPS, RITA DESOLLAR, MARY ELLIS, REBEL ELY, CINDI FARKAS, ROSALINDA GANDARA, MARIA HIGGINBOTHAM, JILL HOLBROOK, DWAYNE HOLLEY, KAIYA HOLLEY, KRISTINA IRVING, JEANNIE JOHNSON, KATHLEEN MALONE, FARIS MATIN, ELIZABETH MAWAKA, FELICITA MORALES, S. RAYMOND PARKER, BARBARA PIERPONT, ROBIN PIERRE, TERRY SAFRANEK, and HAL SCHEER, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:12CV2871 <br><br> <u>CLASS ACTION</u> <br><br> Judge Robert W. Gettleman <br><br> CONSOLIDATED WITH: <br> 3:12CV880 (D. Conn.) <br> 4:12CV4774 (N.D. Cal.) <br> 4:12CV4785 (N.D. Cal.) <br> 1:13CV1512 (N.D. Ill.) <br> 1:13CV4159 (N.D. Ill) |
| Plaintiffs, | <u>DEMAND FOR JURY TRIAL</u> |
| vs. | |
| NESTLE PURINA PETCARE COMPANY, WAGGIN' TRAIN LLC, COSTCO WHOLESALE CORPORATION, CVS CAREMARK CORPORATION (doing business as CAREMARK ADVANCED TECHNOLOGY PHARMACY LLC and CVS PHARMACY INC.), PET SUPPLIES PLUS OF CONNECTICUT XI LLC, PETSMART INC., TARGET CORPORATION, WALGREEN COMPANY, WAL-MART STORES, INC. (doing business as WALMART and SAM'S CLUB), and DOES 1-20, | |
| Defendants. | |

**SECOND AMENDED CONSOLIDATED COMPLAINT**

898746_3

Plaintiffs Dennis Adkins, Tracy Bagatta, Deborah Cowan, Mary Ellen Deschamps, Rita DeSollar, Mary Ellis, Rebel Ely, Cindi Farkas, Rosalinda Gandara, Maria Higginbotham, Jill Holbrook, Dwayne Holley, Kaiya Holley, Kristina Irving, Jeannie Johnson, Kathleen Malone, Faris Matin, Elizabeth Mawaka, Felicita Morales, S. Raymond Parker, Barbara Pierpont, Robin Pierre, Terry Safranek, and Hal Scheer (collectively, "Plaintiffs"), for themselves and all others similarly situated (the "Class" or "Class Members"), bring this class action against defendants Nestle Purina PetCare Company ("Nestle Purina"), Waggin' Train LLC ("Waggin' Train"), Costco Wholesale Corporation ("Costco"), CVS Caremark Corporation ("CVS"), Pet Supplies Plus of Connecticut XI LLC ("Pet Supplies Plus"), PetSmart Inc. ("PetSmart"), Target Corporation ("Target"), Walgreen Company ("Walgreens"), and Wal-Mart Stores Inc. (doing business as "Walmart" and "Sam's Club") (collectively, "Defendants"). Plaintiffs' claims are based on their own knowledge, or where there is no personal knowledge, upon information and belief, or the investigation of their counsel.

## NATURE OF THE ACTION

1.     This nationwide class action challenges Defendants' unlawful scheme to market and sell defective chicken and duck jerky treats imported from the People's Republic of China (the "Jerky Treats"), which were known by Defendants to cause sickness and death in dogs at the time the treats were marketed and sold to the consuming public.

2.     Despite their knowledge of the harm caused by the Jerky Treats, Defendants represented that the Jerky Treats, marketed under the "Waggin' Train" or "Canyon Creek Ranch" brand names, were wholesome and suitable for consumption by dogs. Defendants promoted the Jerky Treats as being, *inter alia*, "natural," "genuine," "wholesome," "healthy," and made from "only the most simple and pure ingredients." In so doing, Defendants did not disclose the material fact that the Jerky Treats were poisonous to dogs, as they were manufactured and processed with harmful antibiotics, diseased bird parts, and other toxic ingredients, in Chinese facilities that were

not subject to the same oversight as their counterparts in the United States. Nor did Defendants warn of the known dangers of feeding the Jerky Treats to dogs, despite years of complaints by pet owners to the Food and Drug Administration ("FDA"), and to Defendants directly. No one, including Plaintiffs, would have purchased the Jerky Treats had they known of the risk of illness or death posed by the treats.

3.      Plaintiffs' dogs became sick soon after consuming the Jerky Treats, as they suffered from gastrointestinal distress, vomiting, diarrhea, increased urination, lethargy, and eventually, liver and kidney problems. Some of the dogs could not recover from their injuries and perished, not long after eating the treats.

4.      The illnesses suffered by Plaintiffs' pets were not isolated events. Thousands of dog owners across the country have reported similar illnesses after feeding the Jerky Treats to their pets. In response to such reports, the FDA issued multiple warnings, beginning in 2007, about the dangers associated with Chinese-made dog jerky treats.

5.      In January 2013, the New York State Department of Agriculture and Markets ("NYSDAM") tested randomly-selected packages of Jerky Treats and announced that the treats were contaminated with unlawful levels of antibiotics that are not approved for use in the United States. Thereafter, Nestle Purina and Waggin' Train finally agreed to withdraw the Jerky Treats from the market. The withdrawal came far too late, as Plaintiffs and many other pet owners had already purchased and fed the Jerky Treats to their dogs – causing them to become ill or die.

6.      Plaintiffs, for themselves and all others similarly situated, bring this action under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §1961 *et seq.* ("RICO")); for breach of express and implied warranties under the Uniform Commercial Code and Magnuson-Moss Warranty Act (15 U.S.C. §2301 *et seq.* ("MMWA")); for unjust enrichment; under strict product liability theories; and under various state consumer protection and product liability statutes.

- 2 -

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under 28 U.S.C. §1331, because Plaintiffs'

claims arise under the RICO Act, 18 U.S.C. §1962.  The Court has supplemental jurisdiction over

Plaintiffs' state law claims under 28 U.S.C. §1367.  Personal jurisdiction over Defendants exists

under 18 U.S.C. §§1965(b) and (d).

8.      This Court also has jurisdiction under 28 U.S.C. §1332(d), as modified by the Class

Action Fairness Act of 2005, because: (i) at least one member of the Class is a citizen of a different

state than Defendants; (ii) there are over 100 members of the Class; and (iii) the aggregate amount in

controversy exceeds $5,000,000, exclusive of interest and costs.  The citizenship of each party is

fully described below.

9.      Venue is proper in this Court under 28 U.S.C. §1391(a), because: (i) Plaintiffs Adkins

and DeSollar reside in this District; (ii) Defendants conduct substantial business in this District and

have intentionally availed themselves of the laws and markets within this District; and (iii) many of

the acts and transactions giving rise to this action occurred in this District, including, *inter alia*,

Defendants' promotion, marketing, distribution and sale of the Jerky Treats in this District.

## PARTY ALLEGATIONS

### *Plaintiffs*

10.     **Dennis Adkins**

(a)      Dennis Adkins is an Illinois citizen.

(b)      On or about March 11, 2012, Mr. Adkins purchased a package of Waggin'

Train "Yam Good" Jerky Treats from a Walmart store near his home in Orland Park, Illinois.  When

doing so, Mr. Adkins relied on the packaging and labeling of the Jerky Treats and believed the treats

to be safe, nutritious and suitable for consumption by dogs, as represented.  He also relied on the fact

- 3 -

that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)     Between March 13-15, 2012, Mr. Adkins fed the Jerky Treats to his Pomeranian, Cleopatra (or Cleo), who at that time was 9 years old and otherwise in good health. No other changes were made to the dog's diet.

(d)     Cleopatra became sick soon thereafter and, on March 26, 2012, died of kidney failure.

(e)     Mr. Adkins owns another Pomeranian named Pharaoh. Pharaoh did not eat any of the "Yam Good" treats and did not become ill.

(f)     Mr. Adkins suffered economic damages of more than $2,300 because of Defendants' conduct, including the value of Cleopatra, veterinary expenses incurred in treating his pet, the cost of disposition of his pet, and the cost of Defendants' product.

(g)     Had Mr. Adkins known about the toxic and defective nature of the Jerky Treats, he never would have purchased the treats and would not have fed them to Cleopatra.

(h)     Mr. Adkins gave notice of his claim to Defendants prior to bringing this action.

11.     **Tracy Bagatta**

(a)     Tracy Bagatta is a New York citizen.

(b)     In or around May 2011, Ms. Bagatta began buying packages of Waggin' Train Chicken Jerky Treats and Waggin' Train "Mixed Grill" Jerky Treats from a BJ's Warehouse store in New York.

(c)     Ms. Bagatta purchased the treats for her then 8 year-old mixed-breed dog, Ginger. When doing so, Ms. Bagatta relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented. She also relied on

- 4 -

the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(d)     After eating the Jerky Treats, Ginger suffered from fatigue and diarrhea. Thereafter, Ginger received veterinary treatment, and the dog's condition slightly improved for a short period of time.  Ginger's prior symptoms soon returned, and continued with loss of appetite and vomiting blood.  Ginger continues to have medical problems and requires daily medication.

(e)     Ms. Bagatta suffered economic damages, through payments to her veterinarian for the care of her pet of approximately $4,000, and the cost of Defendants' product.

(f)     Had Ms. Bagatta known about the toxic and defective nature of the Jerky Treats, she never would have purchased the treats and would not have fed them to Ginger.

(g)     Ms. Bagatta gave notice of her claim to Defendants prior to bringing this action.

12.     **Deborah Cowan**

(a)     Deborah Cowan is a Texas citizen.

(b)     In or around late February or March 2012, Ms. Cowan purchased a package of Waggin' Train "Jerky Tenders" Jerky Treats from a Walmart store in Amarillo, Texas.  When doing so, Ms. Cowan relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented.  She also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)     Ms. Cowan owned a dog named Rowdy, who weighed approximately 15 pounds.  Rowdy was approximately 8 years old at the time and in good health.  Ms. Cowan fed the Jerky Treats to Rowdy for approximately two weeks, with no other changes to his diet.

- 5 -

(d)　　On or about March 13, 2012, Rowdy became ill. A veterinarian who treated Rowdy reported that the dog was: "toxic, dehydrated and extremely ill. His urinalysis indicated kidney damage. He displayed renal pain, an enlarged liver, and an extremely high blood sugar. With aggressive therapy, Rowdy survived but still suffers from the damage created by the toxic treats and requires daily insulin therapy. He remains in poor health." In the veterinarian's opinion, the Jerky Treats caused Rowdy's illness.

(e)　　Within months, Rowdy had to be euthanized, after suffering from kidney failure.

(f)　　Ms. Cowan suffered economic damages because of Defendants' conduct of at least $1,000, including veterinary expenses incurred in treating the dog, the economic value of her dog, the cost of disposition, and the cost of Defendants' product.

(g)　　Had Ms. Cowan known about the toxic and defective nature of the Jerky Treats, she never would have purchased the treats and would not have fed them to Rowdy.

(h)　　Ms. Cowan gave notice of her claim to Defendants prior to bringing this action.

13.　　**Mary Ellen Deschamps**

(a)　　Mary Ellen Deschamps is a Connecticut citizen.

(b)　　In 2010, Ms. Deschamps began buying packages of Waggin' Train Chicken Jerky Treats from a Costco store in Connecticut for Bella, a Lhaso Apso, who was 4 years old at the time. When doing so, Ms. Deschamps relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented. She also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

- 6 -

(c)     Soon after consuming the Jerky Treats, Bella suffered from apparent fatigue, vomiting and diarrhea. Bella eventually developed kidney disease.  Within a month after Ms. Deschamps stopped feeding Jerky Treats to Bella, the dog recovered from her sickness.

(d)     Ms. Deschamps suffered economic damages, through payments to her veterinarian for care of her pets of approximately $3,000, and the cost of Defendants' product.

(e)     Had Ms. Deschamps known about the toxic and defective nature of the Jerky Treats, she never would have purchased the treats and would not have fed them to Bella.

(f)     Ms. Deschamps gave notice of her claim to Defendants prior to bringing this action.

14.     **Rita DeSollar**

(a)     Rita DeSollar is an Illinois citizen.

(b)     Ms. DeSollar purchased packages of Waggin' Train Chicken Jerky Treats from a Walgreens near her home in April 2012.  She purchased the treats for her then 7 year-old German Shepherd, Heidi.  When doing so, Ms. DeSollar relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented. She also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)     Heidi started consuming the treats thereafter.  Heidi experienced major symptoms on May 25, 2012, including excessive vomiting, diarrhea, urination, thirst and lethargy. Heidi's condition worsened over the next few days, including suffering from tremors, and the dog died on May 28, 2012.

(d)     Because of Defendants' conduct, Ms. DeSollar suffered economic damages, including the economic value of her dog, the cost of Defendants' product, and the disposition of her dog.

898746_3

(e)     Had Ms. DeSollar known about the toxic and defective nature of the Jerky Treats, she never would have purchased the treats and would not have fed them to Heidi.

(f)     Ms. DeSollar gave notice of her claims to Defendants prior to bringing this action.

15.     **Mary Ellis**

(a)     Mary Ellis is a California citizen.

(b)     Mary Ellis purchased Waggin' Train Jerky Treats from a Stater Brothers store in Ontario, California, in or around February 2012.  When doing so, Ms. Ellis relied on the packaging of the treats and believed them to be safe and suitable for consumption by dogs, as represented.  She also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)     Ms. Ellis owned three dogs – Buster and Boomer (both of whom were 9 years old at the time), and Maggie (who was 12 years old when she died).  Each dog weighed approximately 50 pounds at the time.

(d)     Ms. Ellis fed the Jerky Treats to all three dogs and made no other changes to their diets.

(e)     In March 2012, all three dogs became sick at or around the same time.  All of the dogs suffered from vomiting and diarrhea.  Each dog frothed at the mouth and had difficulty walking.  One of the dogs, Maggie, later passed away.

(f)     Ms. Ellis suffered economic damages because of Defendants' conduct of at least $6,000, including the value of the dog that passed away, veterinary expenses incurred in treating her dogs, the cost of disposition of the dog that passed away, and the cost of Defendants' products.

- 8 -

(g)     Had Ms. Ellis known about the toxic and defective nature of the Jerky Treats, she never would have purchased the treats and would not have fed them to Buster, Boomer or Maggie.

(h)     Ms. Ellis gave notice of her claim to Defendants prior to bringing this action.

16.     **Rebel Ely**

(a)     Rebel Ely is a California citizen.

(b)     On or around March 3 and 4, 2012, Ms. Ely bought five packages of Waggin' Train Chicken Jerky Treats from a CVS pharmacy near her home in San Mateo, California.

(c)     Ms. Ely purchased the Jerky Treats for her then 6 year-old Golden Retriever, Mocha. When doing so, Ms. Ely relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented. She also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(d)     After eating the Jerky Treats, Mocha developed fatigue and lethargy, vomited and suffered from dehydration and excessive urination. Mocha also panted heavily and lost his balance.

(e)     On or around March 13, 2012, a veterinarian advised Ms. Ely to immediately take Mocha to an emergency veterinary hospital. Testing revealed that Mocha had elevated levels of glucose in his blood.

(f)     Ms. Ely took Mocha for treatment at the veterinary hospital at the University of California at Davis – several hours away from her home in San Mateo. Due to the distance between her home and the hospital, Ms. Ely stayed at a local motel while Mocha was being treated.

(g)     Mocha still suffers from symptoms of his illness and requires a special diet, injections, testing, and follow-up visits.  Further, Mocha's immune system is still impaired and requires further treatment.

(h)     Ms. Ely suffered economic damages, through payments to multiple veterinary facilities for care of her pets, the travel expenses necessary to attend to Mocha's veterinary visits, and the cost of Defendants' product.  Ms. Ely also lost almost two weeks of work for attending to her dog's care and well-being.

(i)     Had Ms. Ely known about the toxic and defective nature of the Jerky Treats, she never would have purchased the treats and would not have fed them to Mocha.

(j)     Ms. Ely gave notice of her claim to Defendants prior to bringing this action.

17.     **Cindi Farkas**

(a)     Cindi Farkas is a New Jersey citizen.

(b)     In or around late March or early April 2012, Ms. Farkas purchased Waggin' Train "Jerky Tenders" Jerky Treats from a Costco store near her home in Howell, New Jersey. When doing so, Ms. Farkas relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented.  She also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)     Ms. Farkas owns a dog named Chanel, who weighed approximately 10 pounds.  Chanel was 6 years old at the time and in good health.  Ms. Farkas fed the Jerky Treats to Chanel for a few weeks.  No other changes in Chanel's diet were made.

(d)     Soon thereafter, Chanel became sick and was diagnosed with kidney disease.

(e)     Because of Defendants' conduct, Ms. Farkas suffered economic damages, including at least $2,035 in veterinary expenses incurred in treating the dog, and the cost of Defendants' product.

(f)     Had Ms. Farkas known about the toxic and defective nature of the Jerky Treats, she never would have purchased the treats and would not have fed them to Chanel.

(g)     Ms. Farkas gave notice of her claim to Defendants prior to bringing this action.

18.     **Rosalinda Gandara**

(a)     Rosalinda Gandara is a California citizen.

(b)     In and throughout 2012, Ms. Gandara regularly purchased packages of Waggin' Train "Wholesome Chicken Jerky Tenders," Waggin' Train "Wholesome Duck Jerky Tenders," and Waggin' Train "Fiddlestix" Jerky Treats, at Walmart stores in San Diego, California and La Mesa, California.

(c)     When Ms. Gandara purchased these Jerky Treats, she believed that such products were safe and legal to give to her dogs, Kahlua and Shyra.  Particularly, she believed that such products were legally produced because the word "wholesome" appears in the name.  She also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(d)     Upon learning that the Jerky Treats were potentially toxic and lethal to her dogs, Ms. Gandara immediately stopped purchasing them.

(e)     Had she known that these treats were potentially harmful to her dogs, she never would have purchased them.

(f)     Ms. Gandara suffered economic damages through the cost of Defendant's products.

- 11 -

19.    **Maria Higginbotham**

(a)    Maria Higginbotham is a Washington citizen.

(b)    On or about January 5, 2012, Maria Higginbotham purchased a package of Waggin' Train "Chik'n Biscuit" Jerky Treats from a Target store near her home in Gig Harbor, Washington. When doing so, Ms. Higginbotham relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented. She also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)    Ms. Higginbotham owns a Rat Terrier, weighing approximately 9 pounds, named Bandit. Bandit was 4 years old at the time and in good health.

(d)    Ms. Higginbotham also owns a second Rat Terrier, Kali, weighing approximately 18 pounds. Kali was 8 years old at the time and in good health.

(e)    In January 2012, Ms. Higginbotham gave the Jerky Treats to Bandit. Bandit's diet was otherwise unchanged. Bandit became sick soon thereafter. The first symptoms that arose were vomiting, diarrhea (with bleeding), lethargy, disorientation, and stumbling while walking. Bandit later collapsed, and was cold to the touch. Upon arrival at the veterinarian, Bandit was diagnosed with low blood pressure, high levels of liver enzymes in the blood streams, and dehydration; it was found that Bandit was suffering from organ failure.

(f)    Bandit required a month of veterinary care, including intravenous transfusion of fluids and several overnight stays at an animal hospital in Tacoma, Washington. Bandit still has not completely recovered from his illness.

(g)    Kali was also fed the treats in early January 2012. However, in the wake of Bandit's illness, Kali was no longer fed the dog treats. Kali was also examined by a veterinarian. Blood work done on or about January 27, 2012, revealed that Kali had elevated liver enzymes in her

bloodstream. When re-examined on or about February 28, 2012, Kali's blood work showed a normal amount of liver enzymes; by this time, Kali had not consumed a Jerky Treat for almost two months.

(h)     Ms. Higginbotham complained directly to Waggin' Train and received a return phone call, saying that claims were being handled by Sedgwick Claims Management Services, Inc. ("Sedgewick") – a third-party claims administrator hired by Nestle Purina and Waggin' Train, located in Memphis, Tennessee and elsewhere.

(i)     Ms. Higginbotham was contacted by Jennifer Dunlap, a case manager for Sedgwick, three weeks after her complaint. Ms. Dunlap told Ms. Higginbotham that no further settlements of claims made against Waggin' Train would be processed, as to do so would be tantamount to a "declaration of guilt."

(j)     Ms. Higginbotham suffered economic damages of at least $3,200 as a result of Defendants' conduct, including veterinary expenses incurred in treating her dogs and the cost of Defendants' product.

(k)     Had Ms. Higginbotham known about the toxic and defective nature of the Jerky Treats, she never would have purchased the treats and would not have fed them to Bandit or Kali.

20.     **Jill Holbrook**

(a)     Jill Holbrook is a Florida citizen.

(b)     In or around February 2012, Ms. Holbrook received a sample of Waggin' Train Chicken Jerky Treats with her purchase of Purina Beneful dog food from Walmart.

(c)     Ms. Holbrook relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented. She also relied on

- 13 -

the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(d)     Ms. Holbrook gave the Jerky Treats to her then 4-year old German Shepherd, R.J.  R.J. had symptoms soon after ingesting the treats, beginning with fatigue, loss of appetite and excessive thirst.  R.J.'s symptoms continued to worsen until he had apparent kidney failure, but recovered from this first incident with veterinary treatment.

(e)     Approximately one month later, Ms. Holbrook received another sample of Waggin' Train Chicken Jerky Treats with her purchase of Purina Beneful dog food from Walmart. Thereafter, R.J. consumed some treats and later had the same symptoms as before.

(f)     On or around March 11, 2012, R.J. died.

(g)     Ms. Holbrook suffered economic damages, through payments to her veterinarian for care of her pet of approximately $1,000, the economic value of R.J., and the cost of Defendants' product.

(h)     Had Ms. Holbrook known about the toxic and defective nature of the Jerky Treats, she never would have fed them to R.J.

(i)     Ms. Holbrook gave notice of her claim to Defendants prior to bringing this action.

21.     **Dwayne and Kaiya Holley**

(a)     Dwayne and Kaiya Holley, who are husband and wife, are New York citizens.

(b)     Between September 2011 and March 2012, the Holleys purchased "Yam Good" Jerky Treats from a Walmart store near their home in Hempstead, Long Island.  When doing so, the Holleys relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented.  They also relied on the fact that the

Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)     The Holleys owned a Yorkshire Terrier named Bootsie, who weighed approximately 13 pounds. Bootsie was 5 years old at the time and in good health. The Holleys fed Bootsie the Jerky Treats between September 2011 and March 2012. Bootsie's diet was otherwise constant throughout this period.

(d)     On March 17, 2012, Bootsie became sluggish, began vomiting, suffered from diarrhea, and urinated in the Holleys' house. Bootsie was taken to a veterinarian and diagnosed as having kidney failure and was placed on dialysis. Bootsie died thereafter, on March 23, 2012.

(e)     Because of Defendants' conduct, the Holleys suffered economic damages of at least $4,000, including the value of their dog, veterinary expenses incurred in treating the dog, the cost of disposition of the dog, and the cost of Defendants' product.

(f)     Had the Holleys known about the toxic and defective nature of the Jerky Treats, they never would have purchased the treats and would not have fed them to Bootsie.

(g)     The Holleys gave notice of their claim to Defendants prior to bringing this action.

22.     **Kristina Irving**

(a)     Kristina Irving is an Alabama citizen.

(b)     In or around August of 2011, Ms. Irving purchased Waggin' Train Chicken Jerky Treats from Walmart. She purchased the treats for her then 7 year-old Greyhound, Rex. When doing so, Ms. Irving relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented. She also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

- 15 -

(c)     After Rex was fed the Jerky Treats, he became lethargic, and suffered from excessive thirst and loss of appetite. The dog also had vomiting and frequent urination.  Ms. Irving brought Rex to a local veterinarian and the dog had to remain there due to dehydration and a suspicion of toxins in its system.

(d)     Because of Defendants' conduct, Ms. Irving suffered economic damages, through payments to her veterinarian for care of her pets of several hundred dollars, and the cost of Defendants' product.

(e)     Had Ms. Irving known about the toxic and defective nature of the Jerky Treats, she never would have purchased the treats and would not have fed them to Rex.

(f)     Ms. Irving gave notice of her claim to Defendants prior to bringing this action.

23.    **Jeannie Johnson**

(a)     Jeannie Johnson is a California citizen.

(b)     In or around January 2011, Ms. Johnson purchased Waggin' Train Chicken Jerky Treats from a Sam's Club store in California.  She purchased the treats for her then 6 year-old dog, Sterling.  When doing so, Ms. Johnson relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented.  She also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)     After consuming these treats, Sterling became lethargic and suffered from fatigue.  He also suffered from neurological disorders, with symptoms such as vertigo, difficulty controlling his rear legs, and difficultly holding his head up.  He also suffered from excessive thirst, excessive urination, and vomiting.

(d)     Ms. Johnson spent several hundred dollars on veterinary care (including consultations and radiologic imaging) for Sterling.  Because of Defendants' conduct, Ms. Johnson

suffered economic damages, including payments to her veterinarian for care of her pets, and the cost of Defendants' product.

(e)     Had Ms. Johnson known about the toxic and defective nature of the Jerky Treats, she never would have purchased the treats and would not have fed them to Sterling.

(f)     Ms. Johnson gave notice of her claim to Defendants prior to bringing this action.

24.     **Kathleen Malone**

(a)     Kathleen Malone is a Louisiana citizen.

(b)     Starting approximately in September 2010, Ms. Malone began buying packages of Waggin' Train Chicken Jerky Treats from a Sam's Club store in Louisiana. She purchased the treats for her then 9 year-old Golden Retriever, Cayenne. When doing so, Ms. Malone relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented. She also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)     After eating the Jerky Treats, Cayenne suffered from fatigue, lethargy, and urinary incontinence. Cayenne's condition later developed renal failure. Cayenne was later euthanized on or about December 15, 2011.

(d)     Because of Defendants' conduct, Ms. Malone suffered economic damages, through payments for veterinarian care of approximately $2,000, the economic value of her dog and the cost of Defendants' product. Further, Cayenne had been a therapy dog since 2007. Certification as a therapy dog requires specialized behavioral training.

(e)     Had Ms. Malone known about the toxic and defective nature of the Jerky Treats, she never would have purchased the treats and would not have fed them to Cayenne.

- 17 -

25.     **Faris Matin**

(a)     Faris Matin is a California citizen.

(b)     In or around December 2010, Mr. Matin purchased a package of "Canyon Creek Ranch Natural Duck Tenders" Jerky Treats from a PetSmart store in Santee, California. When doing so, Mr. Matin relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented. He also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)     Mr. Matin owned a 2 year-old Yorkshire Terrier named BuBu, who weighed between four to five pounds and was an otherwise in good health. A day after purchasing the product, Mr. Matin gave BuBu half a piece of the Jerky Treat. Mr. Matin made no other changes to BuBu's diet.

(d)     Immediately after being fed the Jerky Treat, BuBu suffered from diarrhea. The next day, Mr. Matin gave BuBu another half piece of a Jerky Treat, not realizing the deleterious nature of the treat. BuBu's diarrhea continued.

(e)     The following day, BuBu's conditioned worsened, and the dog could not hold down food or water, vomited, and exhibited extreme lethargy.

(f)     The next morning, Mr. Matin took BuBu to an emergency care veterinarian. BuBu's conditioned worsened still, and his diarrhea included signs of blood. The veterinarian transferred BuBu to a second veterinarian, who monitored and attempted to treat BuBu for two days, but could not help BuBu or alleviate his pain. BuBu died two days later – a mere five days after first eating the Jerky Treats.

- 18 -

(g)    Because of Defendants' conduct, Mr. Matin suffered economic damages, including payments to veterinarians for care of his pet of approximately $2,200, the economic value of his dog and the cost of Defendants' product.

(h)    Had Mr. Matin known about the toxic and defective nature of the Jerky Treats, he never would have purchased the treats and would not have fed them to BuBu.

(i)    Mr. Matin gave notice of his claim to Defendants prior to bringing this action.

26.    **Elizabeth Mawaka**

(a)    Elizabeth Mawaka is a Connecticut citizen.

(b)    On or around September 2010, Ms. Mawaka began buying packages of Waggin' Train Chicken Jerky Treats from a Sam's Club store in Connecticut. When doing so, Ms. Mawaka relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented. She also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)    Ms. Mawaka fed the Jerky Treats to her Boston Terriers, Max, then 11 years old, and Toby, then 6 years old. Max became ill soon after ingesting the Jerky Treats.

(d)    Max's symptoms began with apparent fatigue and lethargy, and the dog falling over as if he had vertigo. Max would also hold his head down, as if he could not pick it up. Max also suffered from excessive thirst, vomiting and excessive urination. Later, Max suffered from seizures. Max had these symptoms until he was euthanized on or about May 18, 2011.

(e)    Toby also got sick from eating the Jerky Treats. Toby's symptoms began as involuntary twitching and quivering of the dog's lip, and then showed signs of dizziness, and lethargy.

(f)     The symptoms Toby suffered were similar to those previously suffered by Max.  Like Max, Toby would not hold his head up, had excessive thirst, and also suffered from seizures and excessive urination.  Toby also began falling over.  Toby had these symptoms until he was euthanized on or about May 10, 2012.

(g)     Because of Defendants' conduct, Ms. Mawaka suffered economic damages, including payments to her veterinarian for care of her pets of several hundred dollars, the economic value of her dog, and the cost of Defendants' product.

(h)     Had Ms. Mawaka known about the toxic and defective nature of the Jerky Treats, she never would have purchased the treats and would not have fed them to Max or Toby.

(i)     Ms. Mawaka gave notice of her claim to Defendants prior to bringing this action.

27.     **Felicita Morales**

(a)     Felicita Morales is a New York citizen.

(b)     In or around March 2013, after the Defendants had purportedly withdrawn the products from the market, Ms. Morales purchased a package of "Waggin' Train Western Grill Variety Pack" Jerky Treats from a Rite Aid store in the Bronx, New York.  When doing so, Ms. Morales relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented.  She also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)     Although Waggin' Train and Nestle Purina had announced a product withdrawal of the Jerky Treats in January 2013, Rite Aid was still offering the treats in March 2013.  Unaware of the product withdrawal, Morales purchased the Jerky Treats at Rite Aid.  There was no notice at Rite Aid that the Jerky Treats had been recalled.

(d)     At the time of her purchase, Ms. Morales owned a 10-pound Maltese named Pete, who was between 5 and 6 years old at the time.

(e)     Shortly after Ms. Morales fed the treats to Pete, the dog exhibited signs of lethargy and stopped being playful.  Pete soon suffered from uncontrollable diarrhea.

(f)     On March 16, 2013, Ms. Morales took Pete to the veterinarian, where he presented symptoms of lethargy, body limpness, and diarrhea.  On the examination table, the veterinarian noticed blood in Pete's diarrhea.  Within 10 minutes, Pete experienced uncontrollable spasms.  Soon thereafter, Pete died of cardiac arrest, within an hour of entering the veterinary clinic.

(g)     Because of Defendants' conduct, Ms. Morales suffered economic damages, including the cost of Defendants' product, the treatment and disposition of her dog, and the economic value of her dog.

(h)     Had Ms. Morales known about the toxic and defective nature of the Jerky Treats, she never would have purchased the treats and would not have fed them to Pete.

28.   **S. Raymond Parker**

(a)     S. Raymond Parker is a Tennessee citizen.

(b)     On or around November 18, 2011, Mr. Parker purchased a package of Waggin' Train Chicken Jerky Treats from Walmart.  He purchased the treats for his then 7 year-old Chow Chow, Sarge.  When doing so, Mr. Parker relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented.  He also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)     After consuming a single Jerky Treat, Sarge suffered from fatigue and lethargy, which worsened over time.  Sarge's other symptoms included vomiting, diarrhea, excessive

thirst, and loss of appetite. Sarge's condition worsened, and he was euthanized on December 1, 2011.

(d)     Because of Defendants' conduct, Mr. Parker suffered economic damages, including payments to his veterinarian for the care of his pet of several thousand dollars, the economic value of his dog, and the cost of Defendants' product.

(e)     Had Mr. Parker known about the toxic and defective nature of the Jerky Treats, he never would have purchased the treats and would not have fed them to Sarge.

(f)     Mr. Parker gave notice of his claim to Defendants prior to bringing this action.

29.     **Barbara Pierpont**

(a)     Barbara Pierpont is a Pennsylvania citizen.

(b)     In March 2012, Ms. Pierpont purchased Waggin' Train "Jerky Tenders" Jerky Treats from a Sam's Club store near her home in Stewartstown, Pennsylvania. When doing so, Ms. Pierpont relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented. She also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)     Ms. Pierpont owned a dog named Honey, who weighed approximately 40 pounds. Honey was 7 years old at the time and in good health.

(d)     Ms. Pierpont fed the Jerky Treats to Honey for a few weeks. No other changes in Honey's diet were made. Honey last consumed the treats on April 10, 2012. Shortly thereafter, Honey died of kidney failure.

(e)     Ms. Pierpont suffered economic damages because of Defendants' conduct, including the value of her dog, veterinary expenses incurred in treating the dog and attempting to save her life, the cost of disposition of the dog, and the cost of Defendants' product.

898746_3

(f)     Had Ms. Pierpont known about the toxic and defective nature of the Jerky Treats, she never would have purchased the treats and would not have fed them to Honey.

(g)     Ms. Pierpont gave notice of her claim to Defendants prior to bringing this action.

30.     **Robin Pierre**

(a)     Robin Pierre is a New York citizen.

(b)     On or around November 12, 2011, Ms. Pierre purchased a package of Waggin' Train Chicken Jerky Treats from a Sam's Club store in New York.  When doing so, Ms. Pierre relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented.  She also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)     Ms. Pierre purchased the treats for her then 2 year-old dogs, Bella and Jack, who were otherwise in good health.  Bella, a Pug, consumed the treats on or around November 12 and 13, 2011.  Jack, a Labrador mix, also consumed the treats on those dates.

(d)     Bella had symptoms soon after ingesting the Jerky Treats, including vomiting, quivering, diarrhea, lethargy, apparent fatigue and excessive thirst.

(e)     On or around November 17, 2011, Ms. Pierre took Bella to her veterinarian for treatment.  Testing showed that Bella had gone into kidney failure.  Bella's condition worsened thereafter.  Bella died on November 21, 2011.

(f)     Jack also developed symptoms soon after ingesting the Jerky Treats, including diarrhea.  After Jack was no longer fed the Jerky Treats, he did not suffer from diarrhea.

(g)     Ms. Pierre suffered economic damages, including payments to her veterinarian for care of her pets of hundreds of dollars, as well the economic value of her dog, and the cost of Defendants' product.

(h)     Had Ms. Pierre known about the toxic and defective nature of the Jerky Treats, she never would have purchased the treats and would not have fed them to Bella or Jack.

(i)     Ms. Pierre gave notice of her claim to Defendants prior to bringing this action.

31.     **Terry Safranek**

(a)     Terry Safranek is an Ohio citizen.

(b)     In the fall of 2011, Terry Safranek purchased a bag of the Waggin' Train "Western Grill" assortment of Jerky Treats from a Sam's Club store in Brooklyn, Ohio. When doing so, Ms. Safranek relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented. She also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)     Ms. Safranek owned a Jack Russell/Fox Terrier mixed breed, named Sampson, which weighed approximately 35 pounds. Sampson was 9 years old at the time and in good health.

(d)     After eating the Jerky Treats for two months, Sampson suffered from diarrhea. On or about December 2, 2011, Ms. Safranek took Sampson to a veterinarian for examination for diarrhea and other symptoms such as lethargy, excessive thirst and urination. On or around January 1, 2012, Sampson's appetite for food diminished significantly and he vomited (with blood) frequently. On or about January 5, 2012, blood work was taken on Sampson, which showed that he was suffering from renal failure. After approximately nine visits to the veterinarian, Sampson was euthanized on January 13, 2012.

(e)     Ms. Safranek gave notice of her claim to Defendants.  She supplied them with the veterinary records and blood work.  She was told by a representative of Sedgwick that her claim was valid, but the company had discontinued offering "good faith" compensation due to the large amount of complaints.

(f)     Ms. Safranek suffered damages because of Defendants' conduct, including payment for veterinarian care of at least $2,110, the economic value of her dog and the cost of Defendants' product.

(g)     Had Ms. Safranek known about the toxic and defective nature of the Jerky Treats, she never would have purchased the treats and would not have fed them to Sampson.

32.     **Hal Scheer**

(a)     Hal Scheer is a Connecticut citizen.

(b)     In or around February 2011, Mr. Scheer began purchasing Canyon Creek Ranch Chicken Jerky Treats from Pet Supplies Plus.  He purchased the Treats for Bela, a then six month old Golden Retriever.  When doing so, Mr. Scheer relied on the packaging and labeling of the treats and believed them to be safe, nutritious and suitable for consumption by dogs, as represented.  He also relied on the fact that the Jerky Treats were offered for sale by the merchant as evidence that the treats were safe, wholesome and fit for canine consumption.

(c)     Bela had symptoms soon after ingesting the Jerky Treats.  She suffered apparent fatigue, vomiting, and diarrhea.  Frequent urination and difficulty lifting her head followed soon thereafter.  She also had bloody stools and intestinal distress.  Bela had intermittent symptoms like these for a year.

(d)     Mr. Scheer suffered economic damages, including payments for veterinarian care of several hundred dollars, and the cost of Defendants' product.  Further, Bela is a therapy dog.

898746_3

Certification as a therapy dog requires specialized behavioral training. Bela could not perform as a therapy dog while ill.

(e)     Had Mr. Scheer known about the toxic and defective nature of the Jerky Treats, he never would have purchased the treats and would not have fed them to Bela.

(f)     Mr. Scheer gave notice of his claim to Defendants prior to bringing this action.

### *Defendants*

33.     Nestle Purina Petcare Company is a Missouri corporation, which maintains its headquarters at Checkerboard Square, St. Louis, Missouri. Nestle Purina does business in Illinois. Nestle Purina manufactures, markets, distributes, and sells pet food products, including the Jerky Treats, through subsidiaries and affiliates in the United States and internationally. Nestle Purina generates tens of billions of dollars in sales each year. Nestle Purina is a wholly-owned subsidiary of Swiss-based conglomerate, Nestlé, S.A., one of the largest food companies in the world.

34.     Waggin' Train LLC is a Delaware limited liability company, with its headquarters at 1924 Pearman Dairy Road, Anderson, South Carolina. Waggin' Train is a subsidiary of Nestle Purina and does business in Illinois. Waggin' Train is a manufacturer and distributor of dog treats and chews, including the Jerky Treats. During the relevant time period, Waggin' Train manufactured, packaged, advertised and sold the Jerky Treats, either under the "Waggin' Train" brand name or the "Canyon Creek Ranch" brand name.

35.     Costco Wholesale Corporation is a citizen of the state of Washington. Costco is a Washington corporation headquartered at 999 Lake Drive, Issaquah, Washington. Costco does business in Illinois. During the relevant time period, Costco marketed and sold the Jerky Treats to consumers, including Plaintiffs.

- 26 -

36.     CVS Caremark Corporation is a citizen of either Delaware or Rhode Island.   It is a Delaware corporation headquartered at 1 CVS Drive, Woonsocket, Rhode Island.  CVS wholly owns and controls subsidiaries throughout the United States that operate as pharmacies and grocery stores. One such subsidiary is CVS Caremark Advanced Technology Pharmacy LLC, which operates in Illinois.  Another is CVS Pharmacy Inc., which operates in California.  On information and belief, these two subsidiaries, and others as yet unknown, direct the operation of CVS locations nationally. During the relevant time period, CVS marketed and sold the Jerky Treats to consumers, including plaintiffs.

37.     Pet Supplies Plus of Connecticut XI LLC is a Connecticut citizen.  It is a Connecticut limited liability company headquartered at 471 Boston Post Road, Orange, Connecticut.   On information and belief, the sole member of Pet Supplies Plus is Per Trellevik, who is a citizen of Connecticut.  During the relevant time period, Pet Supplies Plus marketed and sold the Jerky Treats to consumers, including Plaintiffs.

38.     PetSmart, Inc. is a citizen of either Delaware or Arizona.  It is a Delaware corporation headquartered at 19601 North 27th Avenue, Phoenix, Arizona.  PetSmart does business in Illinois. During the relevant time period, PetSmart marketed and sold the Jerky Treats to consumers, including Plaintiffs.

39.     Target Corporation is a Minnesota citizen.  It is a Minnesota corporation headquartered at 1000 Nicollet Mall, Minneapolis, Minnesota.  Target does business in Illinois.  During the relevant time period, Target marketed and sold the Jerky Treats to consumers, including Plaintiffs.

40.     Walgreen Company is an Illinois corporation, which maintains its principal place of business at 108 Wilmot Road, Deerfield, Illinois.  Its registered agent is Illinois Corporation Service Co., 801 Adlai Stevenson Drive, Springfield, Illinois.  During the relevant time period, Walgreens marketed and sold the Jerky Treats to consumers, including Plaintiffs.

41.     Wal-Mart Stores Inc. is citizen of either Delaware or Arkansas.  Walmart is a Delaware corporation headquartered at 702 S.W. 8th Street, Bentonville, Arkansas.  Walmart does business in Illinois.  Walmart also does business and operates stores under the name "Sam's Club." During the relevant time period, Walmart marketed and sold the Jerky Treats to consumers, including Plaintiffs.

42.     At all relevant times, the "Merchant Defendants," specified in ¶¶35-41, marketed and sold the Jerky Treats and conducted substantial business in Illinois.

43.     Does 1-20 are other persons or entities involved in the manufacture, sale, distribution and marketing of the Jerky Treats.

## COMMON FACTUAL ALLEGATIONS

### *Defendants' Scheme to Market and Sell Defective and Harmful Chinese Jerky Treats*

44.     At all relevant times, Defendants engaged in a common course of conduct, and a fraudulent scheme, to market and sell defective Jerky Treats imported from China, which they knew were unsafe and deleterious to the health of dogs.  Despite being aware, since at least 2007, of thousands of reports of dogs getting sick or dying after consuming the Jerky Treats, Defendants continued to sell the Jerky Treats, all the while concealing their toxicity from the public.

45.     Under the direction of Nestle Purina, Waggin' Train was responsible for manufacturing the Jerky Treats using poultry plants in China and then importing them into the United States.  Waggin' Train and Nestle Purina then relied on the Merchant Defendants and other retail outlets to distribute and sell the Jerky Treats to consumers nationwide.

46.     Waggin' Train and Nestle Purina held themselves out to the public as manufacturers and distributors of safe, high-quality and nutritious pet food.  Waggin' Train's website represented the Jerky Treats as being wholesome, natural and of high quality:

898746_3

The idea for Waggin' Train® treats was cooked up in a kitchen probably not too different from your own. We love to spoil our pets, but got fed up with treats packed with ingredients nature never intended dogs to eat. We searched stores for wholesome treats, but never found any that met our standards. So we decided to make our own. Our dogs went nuts for them and we knew others would too.[1]

47.     Waggin' Train also stated on its website that its treats "are made with chicken or duck, as the #1 ingredient," and are "produced, packaged and inspected in accordance with high sanitation and safety standards."[2]

48.     Waggin' Train and Nestle Purina spent millions of dollars marketing and promoting the Jerky Treats as being high quality, healthy and natural.  Across the range of Jerky Treat varieties offered for sale, Defendants made essentially the same representations and material omissions about the products' wholesomeness and nutritional value.  For example, the packaging of the "Yam Good" Jerky Treats, bought by Mr. Adkins and Mr. and Mrs. Holley, falsely represented that:

(a)     the Jerky Treats in the package were "wholesome";

(b)     the Jerky Treats were "nutritious & great tasting";

(c)     "it's what nature intended";

(d)     "we looked everywhere to find a treat that was better for our dogs";

(e)     the treats were "just wholesome goodness";

(f)     the purchaser should "feel confident that you are giving your dog a wholesome treat that is both healthy and delicious"; and

(g)     "it means a lot to us to help you treat your dog right."

49.     Similarly, the packaging containing "Jerky Tenders" Jerky Treats, bought by Ms. Cowan, Ms. Pierpont and Ms. Farkas, falsely represented that:

---

[1]     *See* http://web.archive.org/web/20121221114247/http://waggintrainbrand.com/about.html.

[2]     *See* http://web.archive.org/web/20121221114250/http://waggintrainbrand.com/products.html.

898746_3

(a) the Jerky Treats in the package were "wholesome chicken" and a "wholesome treat";

(b) the ingredients of the treats "are of the highest quality" and were "nothing but the best";

(c) the treats were "simple" and "natural";

(d) "it's what nature intended";

(e) "we looked everywhere to find a treat that was better for our dogs";

(f) the treats were "just wholesome goodness";

(g) the purchaser should "feel confident that you are giving your dog a wholesome treat that is both healthy and delicious"; and

(h) "it means a lot to us to help you treat your dog right."

50.     Also, the packaging for Canyon Creek Ranch "Natural Duck Tenders" Jerky Treats, bought by Mr. Matin, falsely represented that:

(a) the Jerky Treats in the package were "NATURAL" and "GENUINE";

(b) the treats were "wholesome" and "healthy";

(c) the treats were made using "only the most simple and pure ingredients";

(d) the treats were made with "Duck Breast, Vegetable Glycerin, Natural flavors";

(e) "You'll never find any harsh preservatives or artificial flavors" in the treats; and

(f) "Just like you we love our dogs and want what's best for them."

51.     Other varieties of Jerky Treats manufactured and sold by Defendants made misrepresentations that were identical or similar to those previously described, and were just as false. Plaintiffs and thousands of other consumers nationwide saw these representations, and relied on them.

- 30 -

52.    Contrary to Defendants' assertions and representations, the Jerky Treats were not even close to being wholesome, natural and healthy dog treats.  The Jerky Treats were in fact completely unsafe and unfit for consumption, as they were known to cause severe sickness or death in dogs.  Defendants failed to disclose these material risks and hazards to Plaintiffs and the multitude of consumers, who unwittingly purchased the treats and fed them to their dogs.

53.    The Jerky Treats were manufactured in China and made with ingredients and materials sourced from China.  Since at least 2007, the FDA has received thousands of consumer reports of dogs dying or becoming seriously ill after consuming Chinese-made Jerky Treats.  At least 1,500 illnesses and scores of deaths of pets have been tied to the Jerky Treats manufactured by Waggin' Train and Nestle Purina.

54.    The reports by pet owners whose dogs became ill, or died, after being fed Chinese-made treats are strikingly uniform.  Dogs that have eaten the Jerky Treats have suffered severe gastrointestinal distress, including vomiting or diarrhea, sometimes with blood or mucus.  These symptoms are frequently followed by severe liver or kidney impairment.  Ultimately, many owners saw their dogs' kidneys fail, sometimes leading to the death of the dogs.

55.    It has been reported that Chinese poultry plants commonly use meat from diseased birds in products imported to the United States.  To cut costs, these plants routinely cram sick birds with healthy birds in small confines and process them together.  Such conditions lead to the rampant spread of disease, and the use of excessive and often unapproved doses of antibiotics (some of which are not safe for use at any dosage as discussed below), and other contaminants on the birds.  Defendants did not rectify these unsafe practices and persisted in selling the Jerky Treats to consumers.  Defects may have been caused by other practices and procedures used in these largely unregulated plants, which result in the production of unsafe, unwholesome chicken products.

56.     In January 2013, the NYSDAM announced that it had tested randomly selected Chinese-made jerky treat samples, including those Jerky Treats manufactured, marketed and sold by Defendants, and found they were contaminated with illegal levels of antibiotics. These findings were documented in an article published in the Journal of Agricultural and Food Chemistry, entitled *Determination of Six Illegal Antibiotics in Chicken Jerky Treats*. The NYSDAM article notes that the antibiotic Sulfaquinoxaline was consistently found in the jerky treat samples at abnormally high levels above FDA tolerance. The article also confirms the presence of other antibiotics in the treats, including Sulfaclozine, Enroflaxacin, Trimethoprim, and Tilmicosin, all of which are chemical substances not allowed at any level in poultry products in most industrialized countries, including the United States, Canada and the European Union.

57.     Sulfa-based antibiotics like Sulfaquinoxaline, Sulfaclozine and Trimethoprim are known to cause severe adverse drug reactions in animals, including dogs. Exposure to these antibiotics can cause renal tubular acidosis, a disease that occurs when the kidneys fails to excrete acids into the urine, leaving an excessive accumulation of acid in the bloodstream, and which can cause death.[3] Many of the Plaintiffs and pet owners who complained to the FDA observed their dogs suffering from this exact type of renal tubular damage.

58.     Defendants' illegal and indiscriminate use of antibacterial and antiviral drugs in the Jerky Treats created an unreasonable danger and risk of harm to the dogs consuming the treats, as well as increased the risk of the development of drug-resistant pathogenic bacteria.

59.     Defendants marketed and sold the Jerky Treats without ensuring that the products were safe and fit for consumption by dogs. In fact, Defendants knew of the toxic and hazardous nature of the treats, but continued to sell them anyway.

---

[3]     *See* VETERINARY PHARMACOVIGILANCE, ADVERSE REACTIONS TO VETERINARY MEDICINAL PRODUCTS 141, 429 (K.N. Woodward ed., Wiley-Blackwell 2009).

898746_3

60.     Despite the known risks of Chinese-made pet food products, Defendants failed to adequately monitor the manufacturing of the Jerky Treats in China and did not implement reasonable quality assurance measures to prevent harmful substances, such as unsafe antibiotics, other contaminants, or unhealthy poultry, from being used in the treats.

61.     Defendants' misrepresentations and omissions as to the wholesomeness, quality, and safety of the Jerky Treats were made with the intention that consumers would rely upon them. Indeed, Defendants' misrepresentations and omissions were relied upon by Plaintiffs and thousands of purchasers nationwide. Further, given the presumption that manufacturers and retailers would not sell hazardous food products, Plaintiffs and other consumers relied upon the fact that the Jerky Treats were not pulled from shelves, but rather remained available for purchase.

62.     No reasonable consumer (including Plaintiffs) would have purchased the Jerky Treats for their dogs, which were not even part of their staple diets, but were considered as "wholesome treat[s] that [are] both healthy and delicious," which owners would pamper their pets with, knowing there was a risk of death or illness from consuming such products.

63.     Plaintiffs and many other pet owners are victims of Defendants' deceptive scheme, because they purchased the Jerky Treats based on Defendants' misrepresentations and material omissions, upon which they relied. As a result of Defendants' scheme, Plaintiffs and other consumers nationwide suffered economic damages, including payments for veterinary care and pet disposition, the lost economic value of their dogs, lost money paid for worthless dog treats, and other related economic damages.

### Defendants Callously Disregarded Thousands of Consumer Complaints and Multiple FDA Warnings

64.     Defendants intentionally concealed known facts concerning the defective nature of the Jerky Treats, for motives of pure pecuniary gain. During the relevant time period, Defendants

profited greatly from the sale of the Jerky Treats that were, given their defects, harmful and economically worthless.

65.     Defendants have known for years about the dangers posed by the Jerky Treats, including the risk of death or sickness from their consumption.  They continued to sell the treats anyway, without providing meaningful warnings to consumers, or implementing reasonable precautions to safeguard against those dangers.

66.     The FDA has received thousands of reports of pets getting seriously sick or dying after ingesting them.  In response to the consumer complaints, the FDA issued warnings, beginning in September 2007,  about the "potential association between development of illness in dogs and the consumption of chicken jerky products," stating that:

> Dogs that have become ill, typically show the following signs: decreased food consumption, although some may continue to consume the treats to the exclusion of other foods; decreased activity or lethargy; vomiting; diarrhea, sometimes with blood; increased water consumption or increased urination.  Some or all of these signs may be present in any individual. Blood tests may indicate kidney failure (increased urea nitrogen and creatinine). Urine tests may indicate Fanconi syndrome (increased glucose). Although most dogs appear to recover, some reports to the FDA have involved dogs that have died.

67.     In November 2011, the FDA again issued warnings regarding reports of dog illnesses associated with the consumption of chicken jerky products made in China, noting that "[i]n the last 12 months, FDA has seen it had seen an increased number of complaints it received of dog illnesses," and "some reports to the FDA have involved dogs that have died."  The FDA noted that symptoms included: "decreased appetite; decreased activity; vomiting; and diarrhea."

68.     Despite their knowledge of the harm caused to pets after consuming jerky treats, Defendants did not pull the treats from stores, and did not warn consumers of the dangers and risks of the treats to their pets.

- 34 -

69.     On August 15, 2012, the FDA noted that pet illness complaints had expanded to other jerky pet products such as duck and sweet potato jerky treats, and expanded its investigation to "include[] these types of jerky treat products."

70.     In August 2012, the FDA also issued a list of over 200 product complaints received by its District Consumer Complaint Coordinators between January 1, 2007 and July 2, 2012. Many of these complaints identified the Jerky Treats sold under the Waggin' Train and Canyon Creek Ranch brands as the treats that were consumed by dogs leading to their illness or death.

71.     In its August 15, 2012 update, the FDA stated that its investigation into Chinese-made jerky treats was ongoing, and "samples from recent cases (2011-2012) have been submitted for multiple tests and [m]ore samples are in the process of being collected for testing."

72.     The FDA attempted to conduct onsite testing and investigate the Chinese plants that manufacture Jerky Treat products, including the plants used by Defendants, but the agency received stiff opposition from Chinese officials.

73.     On August 22, 2012, FDA investigators reportedly "came away empty-handed after conducting April inspections at four jerky treat manufacturing sites in [China]," as "Chinese government officials overseeing plants that make chicken jerky pet treats blamed for thousands of illnesses and deaths among American dogs have refused to allow U.S. inspectors to collect samples for independent analysis."[4]   The FDA investigators were reportedly told that they "could collect samples only if they agreed to specific conditions, including a requirement that the samples be tested in Chinese-run laboratories."  As a result, "'no samples were collected during this inspection.'" Further, "reports showed that the Chinese plants conducted either no laboratory tests or only

---

[4]     *See*   http://vitals.nbcnews.com/_news/2012/08/22/13399443-china-stiff-arms-fda-on-jerky-pet-treat-testing-reports-show?lite.

sporadic tests of the raw materials, including meat used in treats fed to many of the 78.2 million pet dogs in the U.S."

74.     By September 2012, the FDA had received around 2,200 complaints of pet sickness or death related to the consumption of Chinese-made jerky treats. Waggin' Train and Canyon Creek Ranch brands of jerky treats were often identified, in these complaints, as the treats consumed by dogs immediately prior to their illness or death.

75.     According to the September 2012 update, "the FDA conducted five plant inspections in China during March and April 2012," and identified concerns about the record keeping practices of the inspected firms, stating that "one firm falsified receiving documents for glycerin, which is an ingredient in most jerky pet treats." Thereafter, the Chinese authority, the Administration of Quality Supervision, Inspection and Quarantine "informed the FDA that it seized products at that firm and suspended exports of its products until corrective actions were taken by the firm."

76.     Nevertheless, Defendants continued to ignore the mounting reports of dog injuries from the Jerky Treats and continued to sell the treats, with no meaningful warning. In fact, Defendants continued to market and sell the Jerky Treats until January 2013, after testing by the NYSDAM revealed that randomly-selected jerky treat samples were contaminated with illegal levels of antibiotics. Only after this did Nestle Purina and Waggin' Train' finally withdraw the Jerky Treats from the market.

77.     Given the NYSDAM's finding that the Jerky Treats were contaminated with synthetic chemical substances, most of which are illegal, Defendants' representations that the treats are "natural," "wholesome," "healthy," and made from "simple and pure ingredients" are patently false and misleading.

78.     The FDA issued another warning in October 2013, which revealed that as of September 2013, it had received reports of over 3,600 dog illnesses and over 580 dog deaths related

- 36 -

to jerky products sourced from China. Many of these complaints concerned Waggin' Train or Canyon Creek Ranch Jerky Treats. The FDA also sought the assistance of veterinarians to report dog sickness and death where the consumption of jerky treats was a suspected cause.

79. The Merchant Defendants adopted the misrepresentations and omissions made by Waggin' Train and Nestle Purina concerning the Jerky Treats. Even after there was notice of the harm caused by the Jerky Treats, through, *inter alia*, the multitude of consumer complaints about the products and the FDA warnings, the filing of this lawsuit in April 2012, and the resulting coverage in the media – the Merchant Defendants continued to sell the treats, without warning at the point of sale or otherwise.

80. The Merchant Defendants learned of the defects and risks of the Jerky Treats when the FDA issued warnings about the products in 2007, and consumers complained that the Jerky Treats they purchased sickened or killed their pets. Despite knowing this, the Merchant Defendants did not: (a) ensure that the products they sold were safe; (b) insist that Nestle Purina and Waggin' Train provide only treats that were not defective; (c) warn consumers of the defects; (d) take the products off the shelves; or (e) take any action necessary to protect consumers' interests.

81. Even after the product withdrawal, the Jerky Treats were still offered for sale in certain retail outlets. As detailed herein, Felicita Morales purchased a package of Jerky Treats from a Rite Aid store many weeks after the January 2013 recall. Ms. Morales' dog fell sick and died, shortly after eating the Jerky Treats.

82. Despite documented and ongoing reports of dog injuries caused by the Jerky Treats, Defendants recently relaunched the Waggin' Train and Canyon Creek Ranch brands and started selling Chinese-made Jerky Treats in the United States again.

898746_3

## CLASS ALLEGATIONS

83.     Plaintiffs bring this action on behalf of themselves and all those similarly situated under Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3).  Plaintiffs seek certification of the following Class:

> *All persons in the United States who purchased or acquired a jerky treat product manufactured and sold by Waggin' Train and Nestle Purina, containing duck or chicken imported from China.*

84.     Excluded from the Class are Defendants' officers, directors or employees, any entity in which any Defendant has a controlling interest and Defendants' affiliates, legal representatives, heirs, or assigns.  Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment, by amended complaint or at class certification proceedings.

85.     *Numerosity*.  The Class is comprised of hundreds of thousands of consumers throughout the United States.  The Class is so numerous that joinder of all members of the Class is impracticable.

86.     *Existence and Predominance of Common Questions*.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class Members.  These common questions include, but are not limited to, the following:

(a)     whether the Jerky Treats manufactured or sold by Defendants were defective;

(b)     whether the Jerky Treats were contaminated, contained harmful ingredients or materials, or were otherwise unfit for consumption by dogs;

(c)     whether Defendants concealed or omitted material information concerning the risk of death or injuries associated with the Jerky Treats;

(d)     whether Defendants' marketing, packaging and/or labels were false, misleading, or reasonably likely to deceive;

- 38 -

(e)     whether Defendants failed to warn of the dangers of the Jerky Treats;

(f)     whether Defendants engaged in deceptive and unfair trade practices;

(g)     whether Defendants expressly or implicitly warranted the Jerky Treats as products that were wholesome and safe or fit for consumption by dogs and breached those warranties;

(h)     whether Defendants violated the RICO Act;

(i)     whether Defendants violated various state consumer protection statutes, as alleged below;

(j)     whether Defendants violated various state product liability statutes, as alleged below;

(k)     whether the Class Members have been injured by Defendants' misconduct;

(l)     whether Plaintiffs and Class Members are entitled to declaratory, injunctive and/or equitable relief; and

(m)     whether Plaintiffs and Class Members are entitled to damages, including actual, statutory, punitive and/or treble damages plus interest thereon, and if so, the nature of such relief.

87.     ***Typicality***.  Plaintiffs' claims are typical of the claims of the Class they seek to represent, in that the named Plaintiffs and all members of the proposed Class purchased or received the Jerky Treats in a typical retail process.  The claims of the named Plaintiffs, and all Class Members, are based on the same factual and legal theories.

88.     ***Adequacy of Representation***.  Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs' claims are coextensive with, and not antagonistic to, the claims of the other Class Members.  Plaintiffs have also retained highly competent counsel to represent their interests and those of the Class, as demonstrated by, *inter alia*, their defense against Defendants' prior motion to dismiss.  Plaintiffs and their counsel have the financial resources to

898746_3

vigorously litigate this class action. Plaintiffs are prepared to serve the Class Members in a representative capacity, and are determined to diligently discharge their duties.

89. *Superiority*. A class action is superior to other available means for the fair and efficient adjudication of this controversy. Class action treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously and efficiently without unnecessary duplication of effort and expense. The damages suffered by individual Class Members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. The class action device provides the benefits of adjudication in a single, manageable proceeding, with economies of scale, and supervision by a single court, at a great savings of time, effort and expense by parties, counsel and the judicial system.

90. Defendants have acted, or refused to act, on grounds generally applicable to the Class, making the award of final, declaratory and injunctive relief proper.

## CAUSES OF ACTION

## COUNT I

**Violations of the Racketeer Influenced and Corrupt Organizations Act,
18 U.S.C. §§1962(c)-(d)
(On Behalf of All Plaintiffs and All Class Members Against Nestle Purina Only)**

91. Plaintiffs incorporate all allegations made herein.

92. This claim arises under 18 U.S.C. §§1962(c) and (d), which provides in relevant part:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

- 40 -

(d)      It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

93.      Nestle Purina is a subsidiary of global food conglomerate, Nestlé S.A., the stock of which is traded on the SIX Swiss Exchange.  Nestle Purina is one of the largest pet care and pet food companies in the world, and conducts its business – legitimate and illegitimate – through various affiliates and subsidiaries, each of which is a separate legal entity.  At all relevant times, Nestle Purina was a "person," as defined in 18 U.S.C. §1961(3), because it was "capable of holding a legal or beneficial interest in property."

94.      In an effort to expand its portfolio of pet food products, particularly its line of dog treats, Nestle Purina acquired Waggin' Train, a limited liability company based in South Carolina.  Upon acquiring Waggin' Train, Nestle Purina installed its executive officers as the executive officers of Waggin' Train.  For example, Nina Leigh Krueger, previously a Vice President of Marketing at Nestle Purina, was installed as President of Waggin' Train.

95.      Waggin' Train constitutes a RICO "enterprise" within the meaning of 18 U.S.C. §1961(4), through which Nestle Purina conducted the pattern of racketeering activity, described herein.  Nestle Purina directed Waggin' Train to engage in fraudulent activities that affected interstate commerce, including the manufacture, sale and distribution of defective Jerky Treats to consumers all over the country.  Nestle Purina used Waggin' Train for its expertise in manufacturing and importing chicken and duck Jerky Treats, which were produced in Chinese poultry plants, using harmful ingredients and unsafe and inferior manufacturing techniques.  Waggin' Train's separate legal status as a limited liability company also facilitated the unlawful scheme and provided a legal shield from liability for Nestle Purina and Nestlé S.A.

96.      Alternatively, Nestle Purina and Waggin' Train, together with the Merchant Defendants and other individuals and entities, operated an association-in-fact enterprise, which was

formed for the purpose of manufacturing, selling and distributing defective Jerky Treats, and through which they conducted a pattern of racketeering activity, under 18 U.S.C. §1961(4). The enterprises alleged in this and the previous paragraph are referred to collectively as the "Jerky Treats Enterprise."

97.     Each participant in the Jerky Treats Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Jerky Treats Enterprise, Nestle Purina and others engaged in consensual decision-making, and functioned as a continuing unit for the common purpose of exacting revenues.

98.     Nestle Purina participated in the operation and management of the Jerky Treats Enterprise by directing its affairs, as described herein. While Nestle Purina participated in, and is a member of, the Jerky Treats Enterprise, it has a separate existence from the Enterprise, including distinct offices, bank accounts, officers, directors, employees, and financial statements.

99.     The Jerky Treats Enterprise was created and/or used as a tool to carry out the elements of Nestle Purina's illicit scheme and pattern of racketeering activity. The Jerky Treats Enterprise has set structures and purposes beyond the scope and commission of Nestle Purina's predicate acts and conspiracy to commit such acts, and is separate and distinct from Nestle Purina itself.

100.     Nestle Purina and the other members of the Jerky Treats Enterprise all had the common purpose to maximize revenues by selling the Jerky Treats, which they knew or recklessly disregarded as defective and toxic to the dogs that consumed them.

101.     The Jerky Treats Enterprise engaged in, and its activities affected, interstate and foreign commerce by designing, manufacturing, marketing, and selling the defective Jerky Treats to hundreds of thousands of persons in the United States.

102.    Nestle Purina exerted substantial control over the Jerky Treats Enterprise, and participated in the enterprise by:

(a)    knowingly manufacturing and importing Jerky Treats that contained hazardous ingredients, materials, or processes;

(b)    persisting in the manufacturing, distribution, and sale of the hazardous Jerky Treats even after the dangers were known;

(c)    designing and distributing marketing materials that misrepresented and concealed the hazards of the Jerky Treats;

(d)    otherwise concealing the defective nature of the Jerky Treats from the public and regulators; and

(e)    collecting revenues and profits from the sale of such products.

103.    At all relevant times, Nestle Purina knew of the ongoing scheme, was a willing participant in it, and made money from it.

104.    Nestle Purina directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because all such information lies in Nestle Purina's and others' hands.

105.    Nestle Purina has committed, or aided and abetted, the commission of at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§1341 and 1343), within the past ten years.  The multiple acts of racketeering activity which Nestle Purina did, or conspired to, or aided or abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."  The racketeering activity was made possible by Nestle Purina's regular use of the facilities, services, distribution channels, and employees of the Jerky Treats Enterprise.

- 43 -

106.     Nestle Purina's predicate acts of racketeering (18 U.S.C. §1961(1)) include, but are not limited to:

(a)     **Mail Fraud**:  Nestle Purina's violated 18 U.S.C. §1341, by sending or receiving, or causing to be sent or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the scheme to manufacture, market, and sell defective and toxic Jerky Treats by means of false pretenses, misrepresentations, promises, and omissions.

(b)     **Wire Fraud**:  Nestle Purina has violated 18 U.S.C. §1343, by transmitting and receiving, or causing to be transmitted or received, materials by wire for the purpose of executing the scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

107.     Nestle Purina used, or directed the use of, thousands of interstate mail and wire communications to create, operate and manage the scheme through virtually uniform misrepresentations, concealments and material omissions.  Nestle Purina's fraudulent use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of:

(a)     the defective Jerky Treats themselves, and the ingredients and materials used therein, including unapproved antibiotics and other harmful substances;

(b)     sales and marketing materials, including advertising, websites, product packaging, and labeling, which misrepresented and concealed the toxic nature of the Jerky Treats, and the risk of harm that the treats posed to dogs;

(c)     documents intended to facilitate the manufacture and importation of defective Jerky Treats, including bills of lading, shipping records, reports and correspondence;

(d)     documents to process and receive payment for the Jerky Treats by unsuspecting consumers, including invoices and receipts;

(e)     deposits of proceeds; and

- 44 -

(f)       other documents and things, including electronic communications.

108.    On or around the dates set forth below, based on information and belief, Nestle Purina and/or Waggin' Train personnel, for the purpose of executing the above-described scheme, caused to be delivered, or received, shipments of the Jerky Treats, at the locations listed by mail or a private interstate carrier[5]:

| From | To | Date | Description |
|---|---|---|---|
| Xuzhou Lianyi Biotech. & Dev. Ltd – Shanghai, China | Waggin' Train, LLC – Long Beach, CA | October 7, 2010 | Shipment of "All Natural Duck Breast Jerky Tenders, Chicken Breast Goods, All Natural Duck Breast Jerky" (33,629.2 lbs) |
| Xuzhou Lianyi Biotech. & Dev. Ltd – Shanghai, China | Waggin' Train, LLC – Long Beach, CA | March 10, 2011 | Shipment of "All Natural Chicken Breast Jerky Tenders" (27,526.4 lbs) |
| Xuzhou Lianyi Biotech. & Dev. Ltd – Shanghai, China | Waggin' Train, LLC – Long Beach, CA | May 19, 2011 | Shipment of "All Natural Duck/Chicken Breast Jerky Tenders" (83,987.2 lbs) |
| Qingdao Kangda Foodstuffs Co., Ltd. – Ching Tao, China | Waggin' Train, LLC – Long Beach, CA | July 1, 2011 | Shipment of "Chicken Jerky Tenders" (40,785 lbs) |
| Suzhou Jinhua Pet Products Co., Lt – Shanghai, China | Waggin' Train, LLC – Long Beach, CA | October 9, 2011 | Shipment of "Pet Chews" (28,968 lbs) |
| Jiangsu Compet Pet Food Products - Shanghai, China | Waggin' Train, LLC – Long Beach, CA | October 19, 2012 | Shipment of "Pet Chews" (33,730 lbs) |
| Joc Great Wall Corp. – Shanghai, China | Waggin' Train, LLC – Long Beach, CA | November 26, 2013 | Shipment of Dog Chews/Treats, Chicken Jerky Tenders (18,128 lbs) |

109.    Further, based on investigation and belief, on or around the dates or months set forth below, Nestle Purina or Waggin' Train personnel or Merchant Defendants, for the purpose of executing the above-described scheme, caused to be transmitted in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those alleged below:

| From | To | Date | Description |
|---|---|---|---|
| Rite Aid store in New York | Chase Bank Credit Card Data Center, Delaware | March 6, 2013 | Debit card authorization for Plaintiff Morales' purchase of the Jerky Treats |
| Sam's Club Store in Connecticut | First Data Processing Centers, Atlanta, Nebraska, and/or Tennessee | September 2010 | Credit card authorization for Plaintiff Mawaka's purchase of the Jerky Treats |

---

[5]    This chart provides only a small sampling of the shipments of the Jerky Treats that Nestle Purina shipped or caused to be shipped to the United States.

| From | To | Date | Description |
|---|---|---|---|
| Sam's Club Store in New York | First Data Processing Centers, Atlanta, Nebraska, and/or Tennessee | November 12, 2011 | Credit card authorization for Plaintiff Pierre's purchase of the Jerky Treats |
| Sam's Club Store in Louisiana | First Data Processing Centers, Atlanta, Nebraska, and/or Tennessee | September 2010 | Credit card authorization for Plaintiff Malone's purchase of the Jerky Treats |

110.     Nestle Purina also used the Internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities.  Specifically, Waggin' Train, under the direction and control of Nestle Purina, made representations about the Jerky Treats on its website, which were intended to mislead the public about the safety and quality of the Jerky Treats, as follows:

(a)     On or around August 8, 2011, Waggin' Train caused to be posted on the "FAQ" section of its website a message in response to the FDA's warnings about jerky treat products from China.  Waggin' Train attempted to deflect concerns about the safety of its Jerky Treats by attributing the cause of the dog injuries to other factors:  "It has been widely accepted that dog illnesses and any association with chicken jerky is likely the result of dogs (mostly small) consuming treats in excess of normal or recommended levels.  Extensive testing performed by public and private laboratories has not uncovered a contaminant or specific ingredient as the cause of illness.  Other factors identified as possibly contributing to signs of illness include sudden alteration of diet or imbalances in total nutrition."  Waggin' Train also reiterated that its products were safe and subject to extensive testing and quality assurance measures:  "Extensive feeding tests and trials confirm that feeding dogs chicken jerky is safe when consumed at recommended levels" and "[t]he safety of Waggin' Train Brand pet treats and chews has always been our top priority and will continue to be in the future.  All Waggin' Train Brand dog treats are manufactured at certified

- 46 -

facilities inspected regularly by our own Quality Assurance team and third party independent auditors."[6]

      (b)     On or around December 12, 2011, Waggin' Train, in response to the FDA's November 18, 2011 warning about jerky treats from China, caused to be posted on the "FAQ" section of its website the following message: "Waggin' Train has a comprehensive food safety program in place to ensure the safety of our products.  We only use high-quality ingredients in our products, and the production facilities are designed and operated to meet U.S. Department of Agriculture standards.  We have a dedicated team of quality control experts in China – particularly, in the plants – when Waggin' Train products are being produced.  They monitor various steps of the manufacturing process for safety and quality of the product.  The safety and efficacy of our products is our top priority, and consumers can and should continue to feed Waggin' Train treats with total confidence."  Waggin' Train also posted an explanation on how it "guarantee[d]" the safety of Jerky Treats made in China: "Waggin' Train has a comprehensive food safety program in place to ensure the safety of its products and to protect against incidents of this nature.  Waggin' Train uses only high-quality ingredients in its products, and the production facilities are designed and operated to meet USDA standards.  Waggin' Train has a dedicated team of quality control experts on the ground in China – in the plants – when the products are being produced.  They monitor various steps of the manufacturing process for safety and quality of the product.  All finished product lots are tested for the presence of melamine and Salmonella."[7]

      (c)     On or around March 19, 2012, Waggin' Train caused to be posted on the "FAQ" section of its website a message concerning the purported wholesomeness of the Jerky

---

[6]    https://web.archive.org/web/20110808170144/http://www.waggintrainbrand.com/faq.html.

[7]    https://web.archive.org/web/20120319052242/http://www.waggintrainbrand.com/faq.html.

Treats, as follows: "Waggin' Train Chicken Jerky Tenders are a wholesome, healthy treat for your dog. They are made with premium chicken breast filets and have only two main ingredients: natural chicken filets, and glycerin (a natural preservative to retain moisture and texture). These high-protein, low-fat treats are slow-baked to seal in the natural flavors for a healthy and wholesome snack. Chicken jerky treats are popular because they are a high-quality, great-tasting treat that dogs love." Waggin' Train further represented that the Jerky Treats were made of safe, high quality ingredients, as follows: "Waggin' Train prides itself on products made of high quality ingredients. Waggin' Train Chicken Jerky Tenders are made with premium chicken breast filets and have only two main ingredients: natural chicken filets, and glycerin (a natural preservative to retain moisture and texture). . . . These treats are made in China at facilities that meet U.S. Department of Agriculture standards for quality and safety. In China, dark meat chicken is more popular with consumers than white meat chicken, and so the supply of quality, white meat chicken used in our products is more readily available for dog treats. The factories are under stringent safety and sanitary guidelines and monitored by a dedicated team of quality control inspectors, who are in the plants where the products are being produced. The benefit to our consumers is a premium dog treat at an affordable price." Waggin' Train further represented on its website that it had implemented a food safety program: "Our quality control group monitors the good manufacturing practices of our suppliers. Our safety inspection program has specific protocols and practices to help ensure proper food handling sanitation practices, heating procedures and traceability of product lots back to the raw ingredients."[8]

> (d) On or around April 28, 2012, Waggin' Train caused to be posted on the "FAQ" section of its website a message explaining why it had not issued a voluntary recall of the

---

[8] https://web.archive.org/web/20120319052242/http://www.waggintrainbrand.com/faq.html.

Jerky Treats: "Waggin' Train products are safe to feed as directed, and millions of dogs continue to enjoy them as a wholesome treat. The FDA has clearly stated that after extensive testing, scientists have been unable to determine a definitive cause for the reported illnesses. According to the FDA, samples collected from all over the United States have been tested for a wide variety of substances and no contaminant has been found. In addition, FDA continues to emphasize that many of the reported illnesses may be the result of causes other than eating chicken jerky."[9]

(e)     On or around September 19, 2012, Waggin' Train caused to be posted on the "FAQ" section of its website a message concerning the purported safety of the Jerky Treats, as follows: "Millions of happy, healthy dogs enjoy Waggin' Train brand dog treats every year. Every day we work to ensure product quality and safety. It is our top priority and the foundation of the Waggin' Train brand. We use high quality ingredients. We have a comprehensive food safety program in place, and all of our facilities are modeled after U.S. Department of Agriculture standards for quality and safety. We have dedicated Quality Assurance teams on site, who monitor various steps of the manufacturing process for the safety and quality of our products."[10]

(f)     On or around January 16, 2013, Waggin' Train caused to be posted on the "FAQ" section of its website a message concerning its withdrawal of the Jerky Treats, as follows: "All of us at Nestlé Purina and Waggin' Train care very deeply about pets and pet owners, and the quality and safety of our products are our top priorities. The New York State Department of Agriculture & Markets (NYSDAM) has advised us that they found trace amounts of antibiotic residue in a limited number of samples of our chicken jerky treats. These trace amounts of antibiotic residue do not pose a health risk to pets. These antibiotics are approved for use in poultry in China

---

[9]     https://web.archive.org/web/20120428200446/http://www.waggintrainbrand.com/faq.html.

[10]    https://web.archive.org/web/20120919182659/http://waggintrainbrand.com/faq.html.

898746_3

and other major countries, including European Union member states, but are not among those approved in the United States. Antibiotics are commonly used globally, including in the United States, when raising animals fit for human consumption. Waggin' Train and Canyon Creek Ranch products are safe to feed as directed. However, due to regulatory inconsistencies among countries, the presence of antibiotic residue is technically considered adulteration in the United States. These findings do not pose a safety risk to pets. The health of pets and the relationship of trust we have with pet owners are critically important to us." Waggin' Train further downplayed any connection between the finding of antibiotic residue in its products and the sicknesses in dogs: "The trace amounts of antibiotic residue do not pose a health risk to pets at the levels detected. There is no connection between the trace amount of antibiotic residue found in these samples and the ongoing FDA investigation into chicken jerky treats."[11]

111.    Nestle Purina also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with Waggin' Train, various other subsidiaries, regional offices, affiliates, divisions and other third-party entities in furtherance of the scheme.

112.    The mail and wire transmissions described herein were made in furtherance of Nestle Purina's scheme to deceive consumers and lure them into purchasing defective Jerky Treats that Nestle Purina knew or recklessly disregarded as posing a significant risk to the health of dogs. These acts of mail and wire fraud were not committed in isolation; rather, they were related and posed a threat of continued fraudulent activity, and therefore constitute a pattern of racketeering activity.

113.    Many of the precise dates of the fraudulent uses of the U.S. mail and wire facilities have been deliberately hidden, and cannot be alleged without access to Nestle Purina's, Waggin'

---

[11]    https://web.archive.org/web/20130116030531/http://waggintrainbrand.com/faq.html.

Train's and the Merchant Defendants' books and records. However, Plaintiffs have described occasions on which the predicate acts of mail and wire fraud would have occurred. They include thousands of communications to perpetuate and maintain the scheme, including the materials described in the preceding paragraphs.

114. Nestle Purina and other members of the Jerky Treats Enterprise have obtained money and property belonging to Plaintiffs and the Class as a result of these violations. Plaintiffs and other Class Members have been injured in their business or property by Nestle Purina's overt acts of mail and/or wire fraud, and by its aiding and abetting others' acts of mail and wire fraud.

115. Nestle Purina has not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. §1962(d), Nestle Purina conspired to violate 18 U.S.C. §1962(c), as described herein. Various other persons, firms and corporations, including entities named as Defendants and some not named as defendants in this Complaint, have participated as co-conspirators with Defendant in these offenses and have performed acts in furtherance of the conspiracy.

116. Nestle Purina aided and abetted others in the violations of the above laws, thereby rendering it indictable as a principal in the 18 U.S.C. §§1341 and 1343 offenses.

117. Nestle Purina engaged in a conspiracy to: (a) increase or maintain revenues; and (b) minimize losses of revenues or profits for Nestle Purina and its co-conspirators.

118. To achieve these goals, Nestle Purina hid from the general public the dangers of the Jerky Treats and obfuscated the true nature of the defect even after it had knowledge of the potential hazards and dangers associated with those Jerky Treats since at least 2007.

119. Nestle Purina and each member of the conspiracy, with knowledge and intent, has agreed to the overall objectives of the conspiracy and participated in the common course of conduct

to commit acts of fraud and indecency in manufacturing, distributing, marketing, and selling the defective Jerky Treats.

120.     Plaintiffs and the Class have been injured in their property by the violations of 18 U.S.C. §§1962(c) and 1962(d), including the loss of their dogs, expenses related to the treatment, medication and disposition of the dogs, the purchase price of the Jerky Treats, and other related expenses. In the absence of the unlawful scheme, Plaintiffs and the Class would not have incurred these economic losses.

121.     Plaintiffs' and the Class' injuries were directly and proximately caused by Nestle Purina's racketeering activities.

122.     Nestle Purina knew and intended that Plaintiffs and the Class would rely on the misrepresentations and omissions about the suitability of the Jerky Treats as nourishment for dogs. Nestle Purina knew and intended that consumers would incur costs as a result. As fully alleged herein, Plaintiffs, along with thousands of other consumers, did place such reliance upon Nestle Purina's representations and omissions.

123.     Because of this deceptive scheme and conspiracy, Plaintiffs and the Class purchased a product that was worse than worthless. Instead of getting "wholesome" dog treats as promised, Plaintiffs received toxic Jerky Treats that caused illness and/or death to their pets. But for the scheme, Plaintiffs and the Class would not have purchased the Jerky Treats. Therefore, the damages suffered by Plaintiffs and the Class may be measured, at a minimum, by each dollar paid for the Jerky Treats, totaling many millions of dollars, even without trebling their damages.

124.     Under 18 U.S.C. §1964(c), Plaintiffs are entitled to recover treble damages plus interest, the costs of bringing this suit, and reasonable attorneys' fees.

898746_3

## COUNT II

### Violations of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301 *et seq.* (On Behalf of All Plaintiffs Against All Defendants)

125.    Plaintiffs incorporate all allegations made herein.

126.    Plaintiffs and Class Members are "consumers" within the meaning of the MMWA.

127.    Defendants, through their agents, employees and/or subsidiaries, are "supplier[s]" and "warrantor[s]" within the meaning of the MMWA.

128.    The Jerky Treats are a "consumer product" as defined by the MMWA.

129.    Defendants' written affirmations of fact, promises and descriptions as alleged created a "written warranty" as to the Jerky Treats.  There was an implied warranty for the sale of such product within the meaning of the MMWA.  Such warranties are further described in the express and implied warranty counts below.

130.    As detailed herein, Defendants breached these express and implied warranties, as the Jerky Treats were not fit for their intended use and were harmful and toxic to dogs.

131.    The Jerky Treats were sold in sealed packaging, and the defects alleged existed when the product left the Defendants' control.

132.    Defendants knew of the defects as early as 2007, when the FDA issued warnings about chicken and ducky jerky treats imported from China, yet failed to remedy these breaches and their conduct, thus damaging Plaintiffs and the Class.

133.    The amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interest and costs) computed on the basis of all claims to be determined.

134.    Plaintiffs and the Class are entitled to recover damages, specific performance, costs, attorneys' fees, rescission and any other relief deemed appropriate.

898746_3

## COUNT III

### Breach of Implied Warranty
### (On Behalf of Plaintiffs and Class Members in Alabama, California, Florida, Illinois, New York, Pennsylvania, and Texas Against All Defendants)

135. Plaintiffs incorporate all allegations made herein.

136. Section 2-314 of the Uniform Commercial Code ("U.C.C.") provides that, unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant regarding goods of that kind.

137. Section 2-314 of the U.C.C. has been adopted in: Alabama (Ala. Code §7-2-314); California (Cal. Com. Code §2314); Florida (Fla. Stat. Ann. §672.314); Illinois (810 Ill. Comp. Stat. Ann. 5/2-314); New York (N.Y. UCC Law §2-314); Pennsylvania (13 Pa. Cons. Stat. §2314); and Texas (Tex. Bus. & Com. Code §2.314).

138. The Jerky Treats are "goods" within the meaning of each statute identified in ¶137.

139. As manufacturers, producers, distributors, marketers and/or sellers of the Jerky Treats, Defendants are "merchants" within the meaning of each statute identified in ¶137.

140. Defendants, as merchants or sellers of the Jerky Treats, represented that the Jerky Treats were safe, healthy, wholesome, and high quality, and impliedly warranted that the Jerky Treats were fit for their intended and ordinary purposes, *i.e.*, that they were safe for canine consumption.

141. The Merchant Defendants adopted the representations made by Waggin' Train and Nestle Purina concerning the Jerky Treats and failed to warn of serious hazards, through actions alleged herein.

142. Contrary to Defendants' representations and in breach of Defendant's implied warranty, the Jerky Treats were not safe, healthy, wholesome, nor fit for consumption, and in fact, contained contaminants or harmful substances that caused illness and/or death in Plaintiffs' dogs.

143.     The Jerky Treats were sold in sealed packaging, and the defects existed when the product left the Defendants' control.

144.     When they designed, manufactured or sold the dog treats, Defendants knew the purpose for which the Jerky Treats were intended, *i.e.*, that they would be consumed by dogs.

145.     Defendants also knew that consumers relied upon them to manufacture and sell dog treats that were reasonably safe and would not endanger their pets' health.

146.     As a direct and proximate result of Defendants' breaches of their implied warranty, Plaintiffs and the Class Members sustained injuries, including, but not limited to: (a) the purchase price of the Jerky Treats; (b) the loss or sickness of their pets; (c) increased risk of health problems in their pets; (d) the costs of veterinarian treatment; and (e) other economic losses.

## COUNT IV

**Breach of Express Warranty**
**(On Behalf of Plaintiffs and Class Members in Alabama, California, Florida, Illinois, New Jersey, New York, Ohio, Pennsylvania, Texas, and Washington Against All Defendants)**

147.     Plaintiffs incorporate all allegations made herein.

148.     Section 2-313 of the U.C.C. provides that an affirmation of fact or promise made by the seller to the buyer which relates to the good and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the promise.

149.     Section 2-313 of the U.C.C. has been adopted in: Alabama (Ala. Code §7-2-313(1)(a)); California (Cal. Com. Code §2313); Florida (Fla. Stat. Ann. §672.313); Illinois (810 Ill. Comp. Stat. Ann. 5/2-313); New Jersey (N.J. Stat. Ann. §12A:2-313); New York (N.Y. UCC Law §2-313); Ohio (Ohio Rev. Code Ann. §1302.26); Pennsylvania (13 Pa. Cons. Stat. §2313); Texas (Tex. Bus. & Com. Code §2.313); and Washington (Wash. Rev. Code Ann. §62A.2-313).

150.     As alleged herein, Defendants manufactured, marketed, and sold the Jerky Treats and represented on their websites, the packaging and labeling of the Jerky Treats, and in advertisements and promotions, that the Jerky Treats were safe, healthy, and for pets, giving rise to an express warranty that the Jerky Treats would conform to Defendants' promises.

151.     The Merchant Defendants adopted the representations made by Waggin' Train and Nestle Purina concerning the Jerky Treats and failed to warn of serious hazards, through actions alleged herein.

152.     Defendants breached their express warranties for the manufacture and sale of the Jerky Treats because the Jerky Treats did not conform to Defendants' express representations as they contained contaminants or harmful substances that caused sickness or death and, thus, were not safe nor fit for consumption by dogs.

153.     Plaintiffs and the Class Members relied on Defendants' express warranties regarding the Jerky Treats.

154.     As a direct and proximate result of Defendants' breaches of express warranty, Plaintiffs and the Class Members sustained injuries, including, but not limited to: (a) the purchase price of the Jerky Treats; (b) the loss or sickness of their pets; (c) increased risk of health problems in their pets; (d) the costs of veterinarian treatment; and (e) other economic losses.

**COUNT V**

**Strict Liability – Defective Design or Manufacture**
**(On Behalf of Plaintiffs and Class Members in Alabama, California, Florida,**
**Illinois, New York, Pennsylvania, and Texas Against All Defendants)**

155.     Plaintiffs incorporate all allegations made herein.

156.     Defendants manufactured, produced, marketed and sold the Jerky Treats that Plaintiffs and the Class Members purchased.

- 56 -

157.     Defendants represented that the Jerky Treats were healthy, wholesome, and safe treats fit for consumption by dogs.

158.     The Merchant Defendants adopted the representations made by Waggin' Train and Nestle Purina concerning the Jerky Treats, and failed to warn of serious hazards, through actions fully alleged herein.

159.     The Jerky Treats were defective, unreasonably dangerous, and unsafe for their ordinary and intended use because they presented the substantial risk of injury, illness, or death to pet dogs owned by Plaintiffs and the Class Members.

160.     The Jerky Treats failed to perform in the manner reasonably expected.

161.     Such defects existed when the Jerky Treats left Defendants' possession.

162.     Defendants' Jerky Treats were expected to, and did, reach Plaintiffs and the Class Members without substantial change in their condition.

163.     Rather than warn consumers about the health risks posed by the Jerky Treats, Defendants actively concealed the defects, which rendered the Jerky Treats unreasonably dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

164.     As a direct and proximate result of the defects in Defendants' Jerky Treats, Plaintiffs and the Class Members sustained injuries, including, but not limited to: (a) the purchase price of the Jerky Treats; (b) the loss or sickness of their pets; (c) increased risk of health problems in their pets; (d) the costs of veterinarian treatment; and (e) other economic losses.

### COUNT VI

**Strict Liability – Failure to Warn**
**(On Behalf of Plaintiffs and Class Members in Alabama, California, Florida, Illinois, New York, Pennsylvania, and Texas Against All Defendants)**

165.     Plaintiffs incorporate all allegations made herein.

166.     Plaintiffs and the Class Members purchased defective and harmful Jerky Treats that were manufactured or sold by Defendants.

167.     Because of warnings from the FDA beginning in 2007, among other notifications, Defendants, at all relevant times, knew or should have known that their Jerky Treats were defective and unreasonably dangerous to dogs.

168.     Ordinary consumers would not recognize the defects in Jerky Treats.

169.     At all relevant times, the Jerky Treats were under Defendants' exclusive control and were sold without adequate warnings their packaging, or in any other way reasonably calculated to fairly warning consumers.

170.     As a direct and proximate result of Defendants' failure to warn, Plaintiffs and the Class Members sustained injuries, including, but not limited to: (a) the purchase price of the Jerky Treats; (b) the loss or sickness of their pets; (c) increased risk of health problems in their pets; (d) the costs of veterinarian treatment; and (e) other economic losses.

## COUNT VII

### Unjust Enrichment
### (On Behalf of Plaintiffs and Class Members in Alabama, Florida, Illinois, Louisiana, New York, Ohio, Pennsylvania, and Texas Against All Defendants)

171.     Plaintiffs incorporate all allegations made herein.

172.     At all relevant times, Defendants manufactured, produced, marketed or sold the Jerky Treats that were hazardous, unsafe, and unsuitable for consumption by dogs because the dogs or make them sick.

173.     Plaintiffs and the Class Members conferred upon Defendants payment for the Jerky Treats, not knowing of the defect in the treats.  Defendants accepted such payment, knowing that consumers were receiving products that were defective and carried the risk of injury or death to their pet, and therefore, Defendants have been unjustly enriched.

- 58 -

174.     Retention of the benefits consumers conferred upon Defendants, under these circumstances, is unjust and inequitable.  Plaintiffs and the Class Members are entitled to, and hereby seek disgorgement and restitution of Defendants' wrongfully obtained revenue in a manner established by the Court.

## COUNT VIII

### Violations of the California Consumer Legal Remedies Act, Cal. Civ. Code §1750 *et seq.* (On Behalf of California Plaintiffs Ellis, Ely, Gandara, Johnson, Matin, and All California Class Members Against All Defendants)

175.     The California Plaintiffs incorporate all allegations made herein.

176.     This Count is brought under the Consumers Legal Remedies Act ("CLRA").  The California Plaintiffs and California Class Members are consumers as defined by Cal. Civ. Code §1761(d).  Their purchases of the Jerky Treats constitute transactions for the sale of "goods" within the meaning of Cal. Civ. Code §§1761 and 1770(a).

177.     As alleged herein, Defendants represented and marketed the Jerky Treats as safe, wholesome, and high quality products suitable for consumption by dogs, while concealing the fact that the Jerky Treats were harmful and could cause serious sickness and death in dogs.  Defendants' statements concerning the wholesomeness, safety and quality of the Jerky Treats were material misrepresentations of facts.

178.     Defendants therefore violated, and continue to violate, the CLRA by engaging in the following practices proscribed by Cal. Civ. Code §1770(a), which were intended to result in, and did result in, the sale of the Jerky Treats to the California Plaintiffs and California Class Members:

(5)     Representing that [the Jerky Treats have] . . . characteristics . . . uses [or] benefits . . . which they do not have . . . .

*          *          *

- 59 -

(7)     Representing that [the Jerky Treats] are of a particular standard, quality or grade . . . if they are of another.

*        *        *

(9)     Advertising goods . . . with intent not to sell them as advertised.

*        *        *

(16)     Representing that [the Jerky Treats have] been supplied in accordance with a previous representation when [they have] not.

179.     The California Plaintiffs and California Class Members reasonably relied upon Defendants' material representations concerning the safety, suitability and wholesomeness of the Jerky Treats, when, in fact, they were hazardous and could cause serious sickness and death in dogs.

180.     Because of warnings by the FDA since 2007, Defendants knew, or should have known, their representations and advertisements regarding the Jerky Treats were false and misleading.

181.     Defendants' conduct is malicious, fraudulent and wanton, and provided misleading information to Plaintiffs, the Class, and the general public.

182.     By reason of the foregoing, the California Plaintiffs and California Class Members have been damaged.

183.     In accordance with Cal. Civ. Code §1782, Plaintiff Matin notified Defendants in writing of their particular violations of Cal. Civ. Code §1770 on December 20, 2012, and demanded that Defendants rectify the actions described above by providing complete monetary relief, agreeing to be bound by their legal obligations, giving notice to all affected customers of their intent to do so. Plaintiff Matin sent this notice by certified mail, return receipt requested, to Defendants' principal place of business.

184.     Plaintiffs Ellis, Ely and Johnson also provided the requisite notice of Defendants' particular violations, in accordance with Cal. Civ. Code §1782, to Defendants on November 8, 2013.

- 60 -

Plaintiffs Ellis, Johnson and Ely sent this notice by certified mail, return receipt requested, to counsel for Defendants.

185.    Defendants have failed to rectify or agree to rectify the conduct complained of herein or give notice to all affected consumers within 30 days of written notice under Cal. Civ. Code §1782. The California Plaintiffs seek monetary and punitive damages under the CLRA, as well as injunctive relief and attorneys' fees and costs as allowed by law.

## COUNT IX

### Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200 *et seq.* (On Behalf of California Plaintiffs Ellis, Ely, Gandara, Johnson, Matin, and All California Class Members Against All Defendants)

186.    The California Plaintiffs incorporate all allegations made herein.

187.    The Unfair Competition Law, Cal. Bus. & Prof. Code §17200 *et seq.* ("UCL") prohibits any "unlawful," "unfair," or "fraudulent" business practice.

188.    Defendants violated §17200's prohibition against engaging in an ***unlawful*** act or practice by, *inter alia*, representing and marketing the Jerky Treats as safe, wholesome and high quality products suitable for consumption by dogs, while concealing the fact that the Jerky Treats were hazardous and could cause serious sickness and death in dogs. Defendants' business acts and practices violated both federal and state laws, including, *inter alia*, 18 U.S.C. §1962, 15 U.S.C. §2301, the CLRA, Cal. Civ. Code §1750 *et seq.*; California's False Advertising Law, Cal. Bus. & Prof. Code §17500 *et seq.*; and California's Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§1791.1(a), 1791.1(b), 1792, and 1792.1, and Cal. Health & Safety Code §§110545, 110550, 110555, 110560, 110575, 110620, 110625 and 110630, among others. The California Plaintiffs reserve the right to identify additional violations of law by Defendants as further investigation and discovery warrants.

- 61 -

189.    Defendants' conduct was also ***unfair***, in violation of the UCL, as it was unethical, oppressive and unscrupulous, and violated fundamental policies of this State.  Further, any purported justifications for Defendants' wrongful conduct are outweighed by the adverse effects of such conduct.

190.    Defendants' above-described conduct was also ***fraudulent***, in violation of the UCL, because Defendants' acts of marketing and selling the Jerky Treats as safe, wholesome and high quality products suitable for consumption by dogs, while concealing the fact that the Jerky Treats were harmful and hazardous and could cause serious sickness and death in dogs.  Defendants' conduct had a tendency and likelihood to deceive the public.

191.    The Merchant Defendants adopted the fraudulent representations made by Waggin' Train and Nestle Purina concerning the Jerky Treats, and failed to warn of serious hazards, through acts fully alleged herein and thus, have also violated the UCL.

192.    The UCL further prohibits any "unfair, deceptive, untrue or misleading advertising." Defendants engaged in unfair, deceptive, untrue and misleading advertising in violation of the UCL, in that Defendants' representations and advertising were likely to deceive the public as to the safety, quality, and suitability of the Jerky Treats.

193.    Defendants' conduct caused and continues to cause substantial injury to the California Plaintiffs and California Class Members.  The California Plaintiffs and California Class Members have suffered injury in fact and incurred economic losses because of Defendants' unlawful, fraudulent, and unfair conduct in violation of the UCL.

194.    Under Cal. Bus. & Prof. Code §17203, the California Plaintiffs and California Class Members seek an order requiring Defendants to immediately cease such unlawful, unfair, and fraudulent business practices and requiring Defendants to return the full amount of money improperly collected to all those who have paid.

898746_3

## COUNT X

### Violations of California's False Advertising Law,
### Cal. Bus. & Prof. Code §17500 *et seq.*
### (On Behalf of California Plaintiffs Ellis, Ely, Gandara, Johnson, Matin,
### and All California Class Members Against All Defendants)

195.    The California Plaintiffs incorporate all allegations made herein.

196.    The False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §17500, *et seq.* prohibits various deceptive practices in connection with the dissemination in any manner of representations which are likely to deceive members of the public to purchase products, such as the Jerky Treats that were marketed and sold by Defendants.

197.    Using the Internet, their websites, traditional means of advertising and promotion, and the packaging of the Jerky Treats themselves, Defendants marketed and promoted the Jerky Treats as safe, wholesome, and high quality products suitable for consumption by dogs, while concealing the fact that the Jerky Treats were harmful and hazardous and could cause serious sickness and death in dogs.

198.    The Merchant Defendants specifically adopted the representations made by Waggin' Train and Nestle Purina concerning the Jerky Treats, and failed to warn of serious hazards, through acts fully alleged herein.

199.    By their actions, Defendants have been and are disseminating uniform advertising concerning the Jerky Treats, which by its nature is unfair, deceptive, untrue, or misleading within the meaning of the FAL.  Such advertisements are likely to deceive, and continue to deceive, the California Plaintiffs and California Class Members.

200.    Defendants intended that consumers rely upon their false advertisements and their numerous material misrepresentations as alleged herein.  In fact, Plaintiffs and California Class Members relied upon those false advertisements and suffered harm as a result.

201.    Defendants' false, misleading, and deceptive advertising is still likely to deceive in that Defendants have failed to disclose the actual dangers associated with the Jerky Treats, and Defendants have failed to instigate a public information campaign to alert consumers, which continues to create a false and misleading perception of the safety of the Jerky Treats.

## COUNT XI

### Violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §501.201 *et seq*. (On Behalf of Florida Plaintiff Holbrook and All Florida Class Members Against All Defendants)

202.    Plaintiff Holbrook incorporates all allegations made herein.

203.    The stated purpose of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. §501.202(2).

204.    Plaintiff Holbrook and the Florida Class Members are consumers, and the Jerky Treats are goods within the meaning of FDUTPA. Defendants are engaged in trade or commerce within the meaning of FDUTPA.

205.    Fla. Stat. Ann. §501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

206.    Fla. Stat. Ann. §501.204(2) states that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to [§]5(a)(1) of the Federal Trade Commission Act."

207.    Defendants have violated FDUTPA by engaging in the unfair and deceptive practices described herein, which offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers.

208.    Plaintiff Holbrook and the Florida Class Members have been aggrieved by Defendants' unfair and deceptive practices in that they relied upon Defendants' representations regarding the safety, suitability, and wholesomeness of the Jerky Treats, when, in fact, they were harmful and hazardous to dogs.

209.    The damages suffered by Plaintiff Holbrook and the Florida Class Members were directly and proximately caused by the deceptive, misleading, and unfair practices of Defendants, as more fully alleged herein.

210.    Under Fla. Stat. Ann. §501.211(1), Plaintiff Holbrook, individually and on behalf of all Florida Class Members, seeks a declaratory judgment and court order enjoining the above-described wrongful acts and practices of Defendants and for restitution and disgorgement.

211.    Under Fla. Stat. Ann. §§501.211(2) and 501.2105, Plaintiff Holbrook, individually and on behalf of the Florida Class Members, makes claims for damages, attorneys' fees, and costs.

## COUNT XII

**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act,
815 Ill. Comp. Stat. Ann. 505/1 *et seq.*
(On Behalf of Illinois Plaintiffs Adkins and DeSollar and All Illinois Class Members
Against All Defendants)**

212.    The Illinois Plaintiffs incorporate all allegations made herein.

213.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that

- 65 -

others rely upon the concealment, suppression or omission of any material fact." 815 Ill. Comp. Stat. Ann. 505/2.

214.    The Illinois Plaintiffs and the Illinois Class Members are consumers, and the Jerky Treats are goods within the meaning of the ICFA. Defendants are engaged in trade or commerce within the meaning of the ICFA.

215.    Defendants have violated the ICFA by engaging in the unfair and deceptive practices described herein, which offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers.

216.    The Illinois Plaintiffs and the Illinois Class Members have been aggrieved by Defendants' unfair and deceptive practices in that they purchased Defendants' Jerky Treats and fed them to their pet dogs due to their justifiable reliance on Defendants' representations that the Jerky Treats were "natural," "genuine," "wholesome," "healthy," "the highest quality," made from "only the most simple and pure ingredients," and that the treats were generally safe for consumption by dogs when, in fact, the Jerky Treats posed serious health risks to pets.

217.    The Merchant Defendants adopted the representations made by Waggin' Train and Nestle Purina concerning the Jerky Treats, and failed to warn of serious hazards, through acts fully alleged herein.

218.    The damages suffered by the Illinois Plaintiffs and the Illinois Class Members were directly and proximately caused by Defendants' deceptive, misleading, and unfair practices, as more described herein.

## COUNT XIII

**Violations of the New York Deceptive Practices Act,
N.Y. Gen. Bus. Law §349 *et seq.*
(On Behalf of New York Plaintiffs Bagatta, D. Holley, K. Holley, Morales, Pierre,
and All New York Class Members Against All Defendants)**

219.    The New York Plaintiffs incorporate all allegations made herein.

220.    New York Gen. Bus. Law §349(a) declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York State]."

221.    The New York Plaintiffs and the New York Class Members are persons within the meaning of N.Y. Gen. Bus. Law §349(h). Defendants are engaged in business, trade or commerce or in the furnishing of services within the meaning of N.Y. Gen. Bus. Law §349(a).

222.    Defendants engaged in consumer-oriented conduct that was materially misleading and generally directed at the consuming public. The fundamental nature of Defendants' activity was to mislead the consuming public into believing that Defendants' Jerky Treats were safe and suitable for consumption by dogs when, in fact, they were toxic and caused serious illness or death.

223.    The Merchant Defendants adopted the representations made by Waggin' Train and Nestle Purina concerning the Jerky Treats, and failed to warn of serious hazards, through acts fully alleged herein.

224.    Defendants willfully and/or knowingly violated N.Y. Gen. Bus. Law §349.

225.    The New York Plaintiffs and the New York Class Members have been injured by Defendants' deceptive acts or practices, in that their pets have been exposed to dangerous treats that pose serious health risks, including sickness and death.

226.     The damages suffered by the New York Plaintiffs and the New York Class Members were directly and proximately caused by the materially misleading acts or practices of Defendants, as alleged herein.

227.     The New York Plaintiffs and the New York Class Members have no adequate remedy at law.

228.     Under N.Y. Gen. Bus. Law §349(h), the New York Plaintiffs, individually and on behalf of the all New York Class Members, seek a court order enjoining the above-described wrongful acts and practices of Defendants, as well as, actual, statutory, and treble damages, costs and expenses, pre- and post-judgment interest, and attorneys' fees.

## COUNT XIV

**Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. §201-1 *et seq.*
(On Behalf of Pennsylvania Plaintiff Pierpont and All Pennsylvania Class Members Against All Defendants)**

229.     Plaintiff Pierpont incorporates all allegations made herein.

230.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL") provides a private cause of action for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act." 73 Pa. Cons. Stat. §201-9.2.

231.     As alleged above, Defendants sold and falsely marketed the Jerky Treats as safe, wholesome, and high quality products suitable for consumption by dogs, when in fact, the Jerky Treats were harmful and could cause serious sickness and death in dogs.

232. The Merchant Defendants specifically adopted the representations made by Waggin' Train and Nestle Purina concerning the Jerky Treats, and failed to warn of serious hazards, through acts fully alleged herein.

233. Defendants therefore violated and continue to violate, the PUTPCPL by engaging in the following practices proscribed by the act, which were intended to result in, and resulted in, the sale of the Jerky Treats to Plaintiff Pierpont and the Pennsylvania Class Members:

(v)    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have . . . ;

*      *      *

(vii)    Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

*      *      *

(ix)    Advertising goods or services with intent not to sell them as advertised;

*      *      *

(xiv)    Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made; [and]

*      *      *

(xxi)    Engaging in any other fraudulent *or deceptive* conduct which creates a likelihood of confusion or of misunderstanding.

73 Pa. Cons. Stat. §201-2(4).

234. Plaintiff Pierpont and the Pennsylvania Class Members reasonably relied on Defendants' representations regarding the safety, suitability, and wholesomeness of the Jerky Treats, when instead they were harmful to dogs.

235. By the foregoing, Plaintiff Pierpont and the Pennsylvania Class Members haven been irreparably harmed, entitling them to injunctive relief, disgorgement, restitution, and damages.

- 69 -

## COUNT XV

### Violations of the Washington Consumer Protection Act,
### Wash. Rev. Code Ann. §19.86.010 *et seq*.
### (On Behalf of Washington Plaintiff Higginbotham and All Washington Class Members
### Against All Defendants)

236.    Plaintiff Higginbotham incorporates all allegations made herein.

237.    The Washington Consumer Protection Act ("WCPA") provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Wash. Rev. Code Ann. §19.86.020.

238.    Defendants are engaged in "trade and commerce" within the meaning of the WCPA.

239.    As alleged above, Defendants sold and falsely marketed the Jerky Treats as safe, wholesome, and high quality products suitable for consumption by dogs, when in fact the Jerky Treats were harmful and caused serious sickness and death in dogs.

240.    The Merchant Defendants specifically adopted the representations made by Waggin' Train and Nestle Purina concerning the Jerky Treats, and failed to warn of serious hazards, through acts fully alleged herein.

241.    Plaintiff Higginbotham and the Washington Class Members have been aggrieved by Defendants' unfair and deceptive practices in that they relied upon Defendants' representations concerning the safety, suitability, and wholesomeness of the Jerky Treats to their detriment.

242.    The damages suffered by Plaintiff Higginbotham and the Washington Class Members were directly and proximately caused by Defendants' deceptive, misleading, and unfair practices, as alleged herein.

243.    Under Wash. Rev. Code Ann. §19.86.090, Plaintiff Higginbotham individually and for all Washington Class Members, seeks a declaratory judgment and court order enjoining the

above-described wrongful acts and practices of Defendants and for restitution and disgorgement, as well as damages, attorneys' fees, and costs.

## COUNT XVI

### Violations of the Connecticut Product Liability Act, Conn. Gen. Stat. §52-572m *et seq*.
### (On Behalf of Connecticut Plaintiffs Deschamps, Mawaka, Scheer and All Connecticut Class Members Against All Defendants)

244.    The Connecticut Plaintiffs incorporate all allegations made herein.

245.    Defendants are "product sellers" within the meaning of Conn. Gen. Stat. §52-572m(a).

246.    The Connecticut Plaintiffs and the Connecticut Class Members purchased defective dog treats that were manufactured or sold by Defendants.

247.    Under Conn. Gen. Stat. §52-572m, Defendants had a duty to exercise reasonable care in the manufacture, processing, packaging, preparing, marketing, supplying, promoting, selling or distribution of the Jerky Treats into the stream of commerce, including a duty to ensure the product would be safe for its intended use, *i.e.*, as a pet food product.

248.    Defendants failed to exercise reasonable care in the manufacture, processing, packaging, preparing, marketing, supplying, promoting, selling or distributing the Jerky Treats into commerce in that, as a result of warnings by the FDA since 2007, Defendants knew or should have known those individuals who purchased and used this product in a manner consistent with its intended use would suffer harm, as alleged more fully above.

249.    Defendants violated Conn. Gen. Stat. §52-572m in that:

(a)    Defendants manufactured, processed, packaged, prepared, marketed, supplied, promoted, sold, or distributed the Jerky Treats without adequate testing;

- 71 -

(b)     Defendants knew or should have known the Jerky Treats were unsafe and unfit for their intended use by the reason of the dangers it posed to its users' pets;

(c)     Defendants failed to adequately warn Plaintiffs of the dangers of the Jerky Treats;

(d)     Defendants failed to immediately recall their dangerous and defective Jerky Treats at the earliest date it became known that the pet food was defective;

(e)     Defendants advertised the Jerky Treats even though Defendants knew or should have known of their dangerous propensities;

(f)     Defendants represented that the Jerky Treats were safe for consumption by pets, when in fact the product was unsafe; and

(g)     Defendants allowed a dangerous product to enter the stream of commerce, knowing it would be fed to Plaintiffs' pets, even though ordinary consumers would not recognize the dangers posed by the Jerky Treats.

250.     As a direct and proximate result of Defendants' failure to exercise reasonable care in the manufacturing, processing, packaging, marketing, selling, or distribution of the Jerky Treats, including their failure to adequately warn of the health risks of the Jerky Treats, the Connecticut Plaintiffs and the Connecticut Class Members have sustained damages, including, but not limited to: (a) the purchase price of the Jerky Treats; (b) the loss or sickness of their pets; (c) increased risk of health problems in their pets; (d) the costs of veterinarian treatment; and (e) other economic losses.

251.     In all of the stated foregoing acts and omissions, Defendants acted with malice, oppression  and such actions were wanton or in reckless or conscious disregard for the rights and safety of product users, consumers or others injured by the products so as to justify an award of punitive, exemplary and compensatory damages under Conn. Gen. Stat. §52-240b.

## COUNT XVII

**Violations of the Louisiana Products Liability Act (Strict Liability –
Dangerous Construction or Composition),
La. Rev. Stat. Ann. §9:2800.55
(On Behalf of Louisiana Plaintiff Malone and All Louisiana Class Members
Against All Defendants)**

252.     Plaintiff Malone incorporates all allegations made herein.

253.     Defendants are the manufacturers, producers, marketers, or sellers of the Jerky Treats
that Plaintiff Malone and the Louisiana Class Members purchased.

254.     Defendants marketed and sold the Jerky Treats as healthy, wholesome, and safe dog
treats fit for consumption by dogs.

255.     The Merchant Defendants adopted the representations made by Waggin' Train and
Nestle Purina concerning the Jerky Treats, and failed to warn of serious hazards, through acts fully
alleged herein.

256.     When the Jerky Treats left Defendants' control, they deviated in a material way from
Defendants' specifications or performance standards for the product or from otherwise identical
products manufactured by Defendants, which rendered the Jerky Treats defective, unreasonably
dangerous, and unsafe for their ordinary and intended use because they failed to perform in the
manner reasonably expected, as an edible product safe for consumption by dogs, in that they caused
injury, illness, or death to the dogs owned by Plaintiff Malone and the Louisiana Class Members.

257.     Defendants' Jerky Treats were expected to, and did, reach Plaintiff Malone and the
Louisiana Class Members without substantial change affecting their condition.

258.     As a direct and proximate cause of the unreasonably dangerous condition of the Jerky
Treats, Plaintiff Malone and the Louisiana Class Members have sustained injuries, including, but not
limited to: (a) the purchase price of the Jerky Treats; (b) the loss or sickness of their pets;

- 73 -

(c) increased risk of health problems in their pets; (d) the costs of veterinarian treatment; and (e) other economic losses.

259.    Under La. Rev. Stat. Ann. §9:2800.55, Defendants are strictly liable to Plaintiff Malone and the Louisiana Class Members for the damages they suffered.

## COUNT XVIII

**Violations the Louisiana Products Liability Act**
**(Strict Liability for Failure to Warn),**
**La. Rev. Stat. Ann. §9:2800.57**
**(On Behalf of Louisiana Plaintiff Malone and All Louisiana Class Members**
**Against All Defendants)**

260.    Plaintiff Malone incorporates all allegations made herein.

261.    Plaintiff Malone and the Louisiana Class Members purchased dog treats that were manufactured, or sold by Defendants.

262.    Because of warnings by the FDA since 2007, Defendants knew or should have known their Jerky Treats were defective or unreasonably dangerous for consumption by dogs at the time of manufacture and distribution.

263.    The Merchant Defendants adopted the representations made by Waggin' Train and Nestle Purina concerning the Jerky Treats, and failed to warn of serious hazards, through acts fully alleged herein.

264.    The Jerky Treats were under Defendants' exclusive control, and were sold without adequate warnings on the product's packaging or in any other way reasonably calculated to give fair warning to consumers of the health risks of the products.

265.    Ordinary consumers would not recognize the risks of Defendants' Jerky Treats.

266.    As a direct and proximate cause of the unreasonably dangerous condition of the Jerky Treats, Plaintiff Malone and the Louisiana Class Members have sustained injuries, including, but not limited to: (a) the purchase price of the Jerky Treats; (b) the loss or sickness of their pets; (c)

increased risk of health problems in their pets; (d) the costs of veterinarian treatment; and (e) other economic losses.

267.     Under La. Rev. Stat. Ann. §9:2800.57, Defendants are strictly liable to Plaintiff Malone and the Louisiana Class Members for the damages they suffered.

## COUNT XIX

**Violations of the Louisiana Products Liability Act (Strict Liability –
Failure to Conform to Product Warranty),
La. Rev. Stat. Ann. §9:2800.58
(On Behalf of Louisiana Plaintiff Malone and All Louisiana Class Members
Against All Defendants)**

268.     Plaintiff Malone incorporates all allegations made herein.

269.     Defendants manufactured, produced, marketed or sold the Jerky Treats that Plaintiff Malone and the Louisiana Class Members purchased.

270.     Defendants marketed, warranted, and sold the Jerky Treats as healthy, wholesome, and safe dog treats fit for consumption by dogs.

271.     The Merchant Defendants specifically adopted the representations made by Waggin' Train and Nestle Purina concerning the Jerky Treats, and failed to warn of serious hazards, through acts fully alleged herein.

272.     Contrary to Defendants' express representations, the Jerky Treats were defective, unreasonably dangerous, and unsafe for their ordinary and intended use because they caused injury, illness or death to the dogs owned by Plaintiff Malone and the Louisiana Class Members.

273.     Such defects existed when the Jerky Treats left Defendants' possession.

274.     Defendants' Jerky Treats were expected to, and did, reach Plaintiff Malone and the Louisiana Class Members without substantial change affecting the condition.

275.     But for Defendants' express representations, Plaintiff Malone and the Louisiana Class Members would not have purchased Defendants' Jerky Treats, nor would they have fed them to their pet dogs.

276.     As a direct and proximate cause of the unreasonably dangerous condition of the Jerky Treats, Plaintiff Malone and the Louisiana Class Members have sustained injuries, including, but not limited to: (a) the purchase price of the Jerky Treats; (b) the loss or sickness of their pets; (c) increased risk of health problems in their pets; (d) the costs of veterinarian treatment; and (e) other economic losses.

277.     Under La. Rev. Stat. Ann. §9:2800.58, Defendants are strictly liable to Plaintiff Malone and the Louisiana Class Members for the damages they suffered.

## COUNT XX

**Violations of the New Jersey Products Liability Act,**
**N.J. Stat. Ann. §2A:58C-1** *et seq.*
**(On Behalf of New Jersey Plaintiff Farkas and All New Jersey Class Members**
**Against All Defendants)**

278.     Plaintiff Farkas incorporates all allegations made herein.

279.     Plaintiff Farkas and the New Jersey Class Members purchased dog treats that were manufactured, distributed, and/or sold by Defendants.  Defendants are all "product sellers" within the meaning of the New Jersey Products Liability Act ("NJPLA").  N.J. Stat. Ann. §2A:58C-8.

280.     Because of warnings by the FDA since 2007, Defendants knew or should have known that their Jerky Treats were defective or unreasonably dangerous for consumption by dogs at the time of manufacture and distribution.

281.     The Jerky Treats were under Defendants' exclusive control, and were sold without adequate warnings on the product's packaging or in other any way reasonably calculated to give fair warning to consumers of the health risks of the products.

282.     When the Jerky Treats left Defendants' possession, they deviated from the design specifications, formulas, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulas in that, contrary to Defendants' representations, the Jerky Treats were not safe, healthy, wholesome or fit for consumption, and contained harmful substances that caused illness or death in dogs.

283.     When the Jerky Treats left Defendants' possession, they did not have adequate warnings or instructions

284.     Ordinary consumers would not recognize the potential risks of the Jerky Treats.

285.     The absence of any warnings or instructions warning consumers of the dangers associated with the Jerky Treats rendered the treats defective because:

(a)     It was likely that the treats would cause the harm suffered by the Plaintiffs;

(b)     Defendants had the ability to anticipate at the time of manufacture that the Plaintiffs would not know of the product risk and the nature of the potential harm; and

(c)     It would be technologically feasible and not cost prohibitive to include such warnings or instructions.

286.     As a direct and proximate cause of Defendants' failure to warn of the health risks of the Jerky Treats, Plaintiff Farkas and the New Jersey Class Members have sustained injuries, including, but not limited to: (a) the purchase price of the Jerky Treats; (b) the loss or sickness of their pets; (c) increased risk of health problems in their pets; (d) the costs of veterinarian treatment; and (e) other economic losses.

287.     Under N.J. Stat. Ann. §2A:58C-1, Defendants are strictly liable to Plaintiff Farkas and the New Jersey Class Members for the damages they suffered.

## COUNT XXI

**Violations of the Ohio Products Liability Act**
**(Defective Design or Formulation),**
**Ohio Rev. Code §2307.71 *et seq.***
**(On Behalf of Ohio Plaintiff Safranek and All Ohio Class Members**
**Against All Defendants)**

288.     Plaintiff Safranek incorporates all allegations made herein.

289.     Defendants manufactured, produced, marketed, or sold the Jerky Treats that Plaintiff

Safranek and the Ohio Class Members purchased.

290.     Defendants marketed and sold the Jerky Treats as healthy, wholesome, and safe dog

treats fit for consumption by dogs.

291.     The Merchant Defendants adopted the representations made by Waggin' Train and

Nestle Purina concerning the Jerky Treats, and failed to warn of serious hazards, through acts fully

alleged herein.

292.     The Jerky Treats were defective, unreasonably dangerous, and unsafe for their

ordinary and intended use because they caused injury, illness. or death to the dogs owned by Plaintiff

Safranek and the Ohio Class Members.

293.     The Jerky Treats failed to perform in the manner reasonably expected *i.e.* as an edible

product safe for consumption by dogs.

294.     Such defects existed when the Jerky Treats left Defendants' possession.

295.     Defendants' Jerky Treats were expected to, and did, reach Plaintiff Safranek and the

Ohio Class Members without substantial change affecting the condition.

296.     As a direct and proximate cause of the unreasonably dangerous condition of the Jerky

Treats, Plaintiff Safranek and the Ohio Class Members have sustained injuries, including, but not

limited to: (a) the purchase price of the Jerky Treats; (b) the loss or sickness of their pets; (c)

increased risk of health problems in their pets; (d) the costs of veterinarian treatment; and (e) other economic losses.

297.     Under Ohio Rev. Code §2307.71, Defendants are strictly liable to Plaintiff Safranek and the Ohio Class Members for the damages they suffered.

## COUNT XXII

**Violations of the Ohio Products Liability Act
(Inadequate Warning or Instruction),
Ohio Rev. Code §2307.71 *et seq*.
(On Behalf of Ohio Plaintiff Safranek and All Ohio Class Members
Against All Defendants)**

298.     Plaintiff Safranek incorporates all allegations made herein.

299.     Plaintiff Safranek and the Ohio Class Members purchased dog treats that were manufactured, distributed, or sold by Defendants.

300.     Because of warnings by the FDA since 2007, Defendants knew or should have known that their Jerky Treats were defective or unreasonably dangerous for consumption by dogs at the time of manufacture and distribution.

301.     The Merchant Defendants adopted the representations made by Waggin' Train and Nestle Purina concerning the Jerky Treats, and failed to warn of serious hazards, through acts fully alleged herein.

302.     The Jerky Treats were under Defendants' exclusive control and were sold without adequate warnings on the product's packaging or in any other way reasonably calculated to give fair warning to consumers of the health risks of the products.

303.     Ordinary consumers would not recognize the potential risks of the Jerky Treats.

304.     As a direct and proximate cause of Defendants' failure to warn of the health risks of the Jerky Treats, Plaintiff Safranek and the Ohio Class Members have sustained injuries, including, but not limited to: (a) the purchase price of the Jerky Treats; (b) the loss or sickness of their pets; (c)

- 79 -

increased risk of health problems in their pets; (d) the costs of veterinarian treatment; and (e) other economic losses.

305.     Under Ohio Rev. Code §2307.71, Defendants are strictly liable to Plaintiff Safranek and the Ohio Class Members for the damages they suffered.

## COUNT XXIII

**Violation of the Tennessee Products Liability Act,**
**Tenn. Code Ann. §§29-28-101 *et seq.***
**(On Behalf of Tennessee Plaintiff Parker and All Tennessee Class Members**
**Against All Defendants)**

306.     Plaintiff Parker incorporates all allegations made herein.

307.     Plaintiff Parker and the Tennessee Class Members purchased dog treats that were manufactured or sold by Defendants.  Defendants are all "manufactures" within the meaning of the Tennessee Products Liability Act ("TPLA").  The Jerky Treats are "products" within the meaning of the TPLA.

308.     Because of warnings by the FDA since 2007, Defendants knew or should have known the Jerky Treats were defective or unreasonably dangerous for consumption by dogs at the time of manufacture and distribution.

309.     As alleged herein, Defendants represented on their websites and on the packaging of the Jerky Treats that the treats were safe, healthy, and fit for consumption by dogs.

310.     The Merchant Defendants specifically adopted the representations made by Waggin' Train and Nestle Purina concerning the Jerky Treats, and failed to warn of serious hazards,  through acts fully alleged  herein.

311.     The Jerky Treat were under Defendants' exclusive control and were sold without adequate warnings on the product's packaging or in any other way reasonably calculated to give fair warning to consumers.

898746_3

312.     Ordinary consumers would not recognize the potential risks of the Jerky Treats.

313.     The absence of any warnings or instructions warning consumers of the dangers associated with the Jerky Treats rendered the treats defective because:

(a)     It was likely that the treats would cause the harm suffered by Plaintiff Parker and the Tennessee Class Members;

(b)     Defendants had the ability to anticipate at the time of manufacture that the Plaintiffs would not know of the product risk and the nature of the potential harm; and

(c)     It would be technologically feasible and not cost prohibitive to include such warnings or instructions.

314.     As a direct and proximate cause of Defendants' failure to warn of the health risks of the Jerky Treats, Plaintiff Parker and the Tennessee Class Members have sustained injuries, including, but not limited to: (a) the purchase price of the Jerky Treats; (b) the loss or sickness of their pets; (c) increased risk of health problems in their pets; (d) the costs of veterinarian treatment; and (e) other economic losses.

315.     Under Tenn. Code Ann. §29-28-101, Defendants are strictly liable to Plaintiff Parker and the Tennessee Class Members for the damages they suffered.

## COUNT XXIV

**Violations of the Washington Products Liability Act,
Wash. Rev. Code Ann. §7.72.010
(On Behalf of Washington State Plaintiff Higginbotham and All Washington
Class Members Against All Defendants)**

316.     Plaintiff Higginbotham incorporates all allegations made herein.

317.     As alleged herein, Defendants manufactured, marketed, and sold the Jerky Treats that they represented to be safe for consumption by canines, and placed the Jerky Treats into the stream of commerce.

- 81 -

318.     Defendants are the manufacturers, producers, distributors, marketers and/or sellers of the Jerky Treats that Plaintiff Higginbotham and the Washington Class Members purchased.

319.     Defendants marketed and sold the Jerky Treats as healthy, wholesome, and safe dog treats fit for consumption by dogs.

320.     The Jerky Treats were defective, unreasonably dangerous, and unsafe to an extent beyond that which would be contemplated by the ordinary consumer because they caused injury, illness, or death to the dogs owned by Plaintiff Higginbotham and the Washington Class Members.

321.     Such defects existed when the Jerky Treats left Defendants' possession.

322.     In reliance on Defendants' representations and warranties, Plaintiff Higginbotham and the Washington Class Members purchased the Jerky Treats and fed them to their pet dogs, which caused serious illness and or death to those pets.

323.     As a direct and proximate cause of the unreasonably dangerous condition of the Jerky Treats, Plaintiff Higginbotham and the Washington Class Members have sustained injuries, including, but not limited to: (a) the purchase price of the Jerky Treats; (b) the loss or sickness of their pets; (c) increased risk of health problems in their pets; (d) the costs of veterinarian treatment; and (e) other economic losses.

324.     Under Wash. Rev. Code Ann. §7.72.010, Defendants are strictly liable to Plaintiff Higginbotham and the Washington Class Members for the damages they suffered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully pray for relief and judgment against Defendants as follows:

A.     For an order certifying the Class and any appropriate subclasses under the appropriate provisions of Federal Rule of Civil Procedure 23, and appointing Plaintiffs and their legal counsel to represent the Class;

- 82 -

B. For an order awarding actual, compensatory, and consequential damages;

C. For an order awarding punitive and treble damages as provided under relevant laws;

D. For an order awarding reimbursement, restitution and disgorgement from Defendants of the benefits unjustly conferred by Plaintiffs and the Class;

E. For an order awarding injunctive and other equitable relief;

F. For an order awarding declaratory relief;

G. For an order awarding pre- and post-judgment interest to the Class, at the highest rate allowed by law;

H. For an order awarding costs, including experts' fees, and attorneys' fees and expenses, and the costs of prosecuting this action; and

I. For an order awarding granting such other and further relief as is just and proper.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury.

DATED: March 12, 2014    ROBBINS GELLER RUDMAN
                & DOWD LLP
              RACHEL L. JENSEN
              PHONG L. TRAN


                s/ Rachel L. Jensen
               RACHEL L. JENSEN

              655 West Broadway, Suite 1900
              San Diego, CA 92101
              Telephone: 619/231-1058
              619/231-7423 (fax)
              rjensen@rgrdlaw.com
              ptran@rgrdlaw.com

898746_3

ROBBINS GELLER RUDMAN
   & DOWD LLP
STUART A. DAVIDSON
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
AMANDA M. FRAME
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
aframe@rgrdlaw.com

DATED: March 12, 2014         EDELMAN COMBS LATTURNER &
GOODWIN LLC
DANIEL A. EDELMAN
CATHLEEN M. COMBS
JAMES O. LATTURNER
TARA L. GOODWIN
THOMAS E. SOULE
CATHERINE A. CEKO

                                          s/ Thomas E. Soule
                                       THOMAS E. SOULE

120 S. LaSalle Street, Suite 1800
Chicago, Illinois 60603
Telephone: 312/739-4200
312/419-0379 (fax)
courtecl@edcombs.com

DATED: March 12, 2014         BROWN PAINDIRIS & SCOTT LLP
BRUCE E. NEWMAN

                                         s/ Bruce E. Newman
                                       BRUCE E. NEWMAN

747 Stafford Avenue
Bristol, Connecticut 06010
Telephone: 860/583 5200
860/589 5780 (fax)
bnewman@bpslawyers.com

DATED:  March 12, 2014                          CLARK LAW FIRM
                                                R. CRAIG CLARK
                                                JAMES M. TREGLIO
                                                LAURA M. COTTER


                                                    s/ R. Craig Clark
                                                R. CRAIG CLARK

                                                205 West Date Street
                                                San Diego, California 92101
                                                Telephone:  619/239-1321
                                                888/273-4554 (fax)
                                                cclark@clarklawyers.com
                                                jtreglio@clarklawyers.com
                                                lcotter@clarklawyers.com

                                                THE TERRELL LAW GROUP
                                                REGINALD VON TERRELL
                                                P.O. Box 13315, PMB No. 148
                                                Oakland, CA  94661
                                                Telephone:  510/237-9700
                                                510/237-4616 (fax)
                                                reggiet2@aol.com

                                                SYDNEY JAY HALL, ESQ.
                                                1308 Bayshore Highway, Suite 220
                                                Burlingame, CA  94010
                                                Telephone:  650/342-1830
                                                sydneyhalllawoffice@yahoo.com

                                                Attorneys for Plaintiffs


                          **ECF CERTIFICATION**

        The filing attorney attests that he has obtained concurrence regarding the filing of this

document from the signatories to this document.


Dated:  March 12, 2014                    By:    s/ Thomas E. Soule
                                                THOMAS E. SOULE

898746_3

CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2014, I authorized the electronic filing of the foregoing

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on March 12, 2014.

 s/ Thomas E. Soule
THOMAS E. SOULE

EDELMAN COMBS LATTURNER
 & GOODWIN LLC
120 S. LaSalle Street, Suite 1800
Chicago, Illinois  60603
Telephone:  312/739-4200
312/419-0379 (fax)

E-mail:  tsoule@edcombs.com

# Mailing Information for a Case 1:12-cv-02871 Adkins v. Nestle Purina Petcare Company et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Miranda L Berge**
  miranda.berge@hoganlovells.com

- **Catherine Anne Ceko**
  cceko@edcombs.com

- **Cathleen M. Combs**
  ccombs@edcombs.com,courtecl@edcombs.com

- **Richard George Douglass**
  rdouglass@novackandmacey.com,ntendy@novackandmacey.com

- **Daniel A. Edelman**
  courtecl@edcombs.com,dedelman@edcombs.com

- **Tara Leigh Goodwin**
  tgoodwin@edcombs.com,jpendleton@edcombs.com

- **Jeffrey W. Gunn**
  jeffrey.gunn@morrisandstella.com

- **Edward Desmond Hogan**
  desmond.hogan@hoganlovells.com

- **Craig A. Hoover**
  craig.hoover@hoganlovells.com

- **James O. Latturner**
  jlatturner@edcombs.com

- **Bruce Edward Newman**
  bnewman@bpslawyers.com

- **Stephen Novack**
  sn@novackandmacey.com,kathyz@novackandmacey.com

- **Thomas Everett Soule**
  tsoule@edcombs.com,courtecl@edcombs.com

- **Reginald Terrell**
  reggiet2@aol.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`